**UNITED STATES of America**

v.

**LaVance GREENE, Appellant.**

**UNITED STATES of America**

v.

**Randolph GREENE, Appellant.**

**Nos. 72–1130, 72–1272.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 30, 1973.

Decided Oct. 4, 1973.

Rehearing En Banc Denied in No. 72–1130
Feb. 1, 1974.

J. Skelly Wright and Spottswood W. Robinson, III, Circuit Judges, would grant rehearing en banc.

Leventhal, Circuit Judge, filed separate statement as to why he would not grant rehearing en banc.

Bazelon, Chief Judge, filed separate statement as to why he would grant rehearing en banc.

Joseph Forer, Washington, D.C. (appointed by this Court), for appellants.

Robert Alan Jones, Asst. U.S. Atty., with whom Harold H. Titus, Jr., U.S. Atty., John Terry and William H. Collins, Jr., Asst. U.S. Attys., were on the brief, for appellee.

Before LEVENTHAL and ROBB, Circuit Judges, and OLIVER GASCH,* United States District Judge for the District of Columbia.

GASCH, District Judge:

Appellant Randolph Greene, while serving a sentence of 20 years for armed bank robbery, was, at his mother's request, permitted to attend the funeral of his father on September 24, 1971. He was accompanied to the funeral by four armed deputy marshals. His half-brother, LaVance Greene, during the course of the funeral service in a crowded church, disarmed the deputy marshals, released his brother from custody, shot to death one of the deputy marshals, took their guns, commandeered at gunpoint a passing automobile, and attempted to escape with his half-brother Randolph. A passing police car gave chase and after a high speed pursuit, with the assistance of two motorcycle officers, several miles later, effected the arrest of the two appellants. Charges of felony murder, premeditated murder of Federal officer, four counts of armed robbery, rescue of a prisoner, as well as escape from custody were brought against the two brothers. Randolph Greene was convicted only of escape. LaVance Greene was convicted by jury verdict of the other charges.

Numerous points are raised by appointed counsel, three of which were emphasized at oral argument. Counsel challenged the jury selection system then in force and effect in this district. He challenged the legality of the felony murder conviction in that the felony LaVance Greene is charged with committing at the time of the shooting of the deputy marshal was a Federal felony which, counsel says, cannot be joined with the local (Title 22, D.C.Code) felony murder statute. He challenges the burden placed on LaVance Greene regarding the insanity instructions. We affirm the judgments on Count 3 (felony murder), Counts 7, 9, 11, and 13 (armed robbery, as to LaVance Greene), and Count 6 as to Randolph Greene. We vacate the remaining judgments of conviction as to LaVance Greene.

I.

CHALLENGE TO THE JURY SELECTION SYSTEM

■ With respect to appellant's first challenge, namely, the jury selection system, the record reflects that the trial

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

judge, on two occasions, extended the time within which pretrial motions could be filed. No request was made by defense counsel to file a motion to dismiss the indictment because of the jury selection system until January 17, 1972, the day of trial. This challenge is untimely. Appellate counsel was uninformed as to when trial counsel for the defense first learned of any problem with respect to the jury selection in the instant case. Counsel filing this motion and swearing to the required affidavit was Miss Sarah E. Brown of the Public Defender Service. The records of the trial Court, of which this Court may take notice, indicate that a similar motion raising the same points was filed in United States v. Johnson, Criminal Case No. 1690–71. Counsel pressing these similar motions in the *Johnson* case were Mr. Robert Weinberg and Mr. Matthew Zwerling, also of the Public Defender Service. The date on which these similar motions were filed and documented with comparable material was October 28, 1971. It is clear that the basis for the motion filed before the trial judge in the instant case was known to Miss Brown's office as early as the 28th of October, 1971.

Section 1867(a) of the Jury Selection and Service Act of 1968, Pub.L. 274 of the 90th Congress, 28 U.S.C. § 1861 et seq., provides as follows:

> (a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or *could have discovered,* by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury. (Emphasis supplied.)

It is reasonable to conclude that the basis for filing these motions was well known to the lawyers who comprise that Service. Failure to file this motion reciting similar grounds as the motion filed in the *Johnson* [1] case until the day of trial stamps the filing as untimely.

Counsel acknowledges that only six of a possible 20 peremptory challenges were made by defense counsel in the process of selecting a petit jury. He conceded he was uninformed as to the composition of the petit jury, that is to say, what their ages were, or what their economic status was. He persists, however, in saying that the jury selection system does not fairly select young people and poor people.

The Jury Selection and Service Act of 1968, Pub.L. 90–274, March 27, 1968, requires that litigants shall have the right to trial by jury, both grand and petit, selected at random from a fair cross-section of the community in the district wherein the court convenes. (Section 1861). Section 1862 prohibits *exclusion* from service of any citizen on the ground of race, color, religion, sex, national origin, or economic status. Section 1863 provides that a plan be devised by the District Court and approved by the Judicial Council of the Circuit and the Chief Judge of the District Court. In conformity with the authorization contained in paragraph (b)(2), the plan for this District utilized the City Directory rather than the voter list. No challenge was made that jurors selected for the grand jury and the petit jury panel were not randomly selected from the City Directory in accordance with the Circuit approved plan.

The motion, filed on the day of trial, contains certain conclusory statements without any adequate underlying factual data. Counsel contends that the poor and the young are excluded from the jury selection plan. The record discloses

---

1. It is further noted that in the *Johnson* case, Judge William B. Bryant of the United States District Court did set the matter for hearing and after having taken testimony on the matters alleged by the Public Defender Service and having considered the matter, did overrule the motion to dismiss the indictment.

no evidence of exclusion on account of race, color, religion, sex, national origin, or economic status (§ 1862). What appellants contend, as we understand their argument, is that since certain rolls of the Manpower Commission and the Bail Agency applicant list reflect a substantial percentage of persons not listed in the City Directory that the selection process must be deficient.

■■ As a matter of decision law, there are a number of objections to the thesis propounded by appellants. First, while it is clear that the intention of the Jury Selection Act is to obtain a jury that is fairly representative of a cross-section of the community (see Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946)), it is also clear that there is no constitutional requirement that the jury pool be a statistical mirror of the community. Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961). The fact, if it is a fact, that there are fewer young people on the jury than the exact proportions of young persons in the community does not of itself make a jury nonrepresentative. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

It bears emphasis that there is no claim in the case before us of a purposeful exclusion of young persons, but only a claim that the system of jury selection results in an under-representation.

The Jury Selection Act itself does not refer to young people as a class. Serious question arises as to whether young people are an identifiable class. No criteria are set forth in the Act on the basis of which the class is described. Young people are characterized by as many variables, varying philosophies, education, earning capacities, as old prople, or middle aged people, or any other group concerning which known and admitted variables exist. With the exception of United States v. Butera,[2] 420 F.

2d 564 (1st Cir. 1970), all Federal courts, both at the trial level and at the circuit level, have held that the category of "young persons" is not a cognizable class that must be systematically mirrored in jury selection procedures. See United States v. Guzman, 337 F.Supp. 140 (S.D.N.Y.1972). The Court said at page 146:

> The mere fact of similarity in age cannot, by itself, be sufficient to define a cognizable group. If it were, any jury selection system could be successfully attacked by a strategic drawing of age group lines.
>
> \* \* \* \* \* \*
>
> In accordance with the long line of cases cited above, this court cannot accept the proposition that members of arbitrarily drawn age brackets necessarily constitute valid categories for measuring the legality of a jury selection system.

To the same effect, see United States v. Gargan, 314 F.Supp. 414 (W.D. Wis. 1970). The *Gargan* case was affirmed by the Seventh Circuit sub nom. United States v. Gast, 457 F.2d 141 (7th Cir. 1972). Judge Frank Kaufman's decision in United States v. Cohen, 275 F.Supp. 724 (D. Md. 1967), was affirmed by the Fourth Circuit sub nom. United States v. DiTommaso, 405 F.2d 385 (4th Cir. 1968). In affirming, the Fourth Circuit said:

> As to age as a measure of representation, we do not believe that members of arbitrarily drawn age brackets necessarily constitute valid categories for measuring the legality of jury selection.

405 F.2d at 391.

To the same effect, see United States v. Kuhn, 441 F.2d 179, 181 (5th Cir. 1971). It is interesting to note that Judge Coffin, who wrote the opinion of the First Circuit in *Butera, supra,* in a subsequent case, United States v. Camara, 451

---

2. In *Butera* the challenge was directed at juries drawn by the key man system prior to the effective date of the Jury Selection and Service Act of 1968. It was, after hearing, rejected. The explanation was that "young people were more likely to be away in the service or pursuing education or to be in a hardship category."

F.2d 1122 (1971), rejected out of hand a contention that persons under 25 were underrepresented on grand juries in the District of Massachusetts.

In the absence of a claim of purposeful exclusion, we see serious problems in a legal claim based on statistical underrepresentation of a sub-class of the young, the middle-aged, the middle-income, manual laborers, college graduates, and so on, ad infinitum, as to all the matters that some lawyers may identify as having a bearing on the jury's action. We have thought it useful to discuss problems presented by appellant's thesis even though, in view of the lack of timely objection, we do not decide this matter on the merits.

■ As to the alleged underrepresentation of persons in the lower economic group, no showing whatsoever has been attempted to show any intentional deletion of such persons. By referring to random sampling, efforts on the part of statisticians to establish that persons on the Manpower Commission rolls, on the Bail Agency lists, and among clients of the Neighborhood Legal Services, are underrepresented, counsel has simply demonstrated that for one reason or other these persons are more likely to move than other members of the general population, but no evidence is supplied indicating exclusionary practices. That is what the Act prohibits. Exclusion of day laborers in *Thiel, supra,* was sufficient to invalidate the conviction. Here, the Court is confronted with no comparable situation.

## II.

### THE FELONY MURDER CONVICTION

■ The third count of the indictment on which LaVance Greene was convicted is drawn under 22 D.C.Code § 2401 (1967) and charges him with first degree murder committed while perpetrating the crime of rescuing a federal prisoner. In pertinent part, 22 D.C. Code § 2401 reads as follows:

> Whoever, being of sound memory and discretion, kills another purposely, * * * in perpetrating or attempting to perpetrate *any offense* punishable by imprisonment in the penitentiary, * * *. (Emphasis added.)

The crime of rescuing a federal prisoner is defined by 18 U.S.C. § 752(a).

The appellant argues that the term "any offense" in Section 22–2401 "includes only the local felonies created by D.C.Code and not the national felonies created by U.S.Code." Contending the rescuing a federal prisoner "is exclusively a national crime", counsel for the appellant reaches the conclusion that there is no statute which creates the offense alleged in the third count. In support of this thesis doubt is expressed that Congress intended "parochial penal legislation", such as the District of Columbia statute, to be applied in implementing statutes creating "national crimes". It is said "a construction favoring such unnecessary implementation will produce discriminatory, harsh results" in that the penalty for first degree felony murder will be more severe in the District of Columbia than elsewhere under the federal statute.

■ The question presented is one of congressional intent: did Congress intend the plain words "any offense" to include a Title 18 offense committed in the District of Columbia? We think Congress did so intend. The Federal Criminal Code embodied in Title 18 and the District of Columbia Criminal Code of Title 22 were both enacted by Congress and were intended to exist together. Johnson v. United States, 225 U.S. 405, 32 S.Ct. 748, 56 L.Ed. 1142 (1912). We believe further that they were intended to mesh with each other, and they have been so construed in the past. Thus a violation of the District of Columbia Code has been held to be an offense against the United States; and an indictment is good which alleges a conspiracy under the federal statute to commit an offense against the United States by violating the District of Columbia Code. United States v. Cella, 37 App.D. C. 423 (1911), cert. denied, 223 U.S. 728, 32 S.Ct. 526, 56 L.Ed. 633 (1912) (con-

spiracy to violate the District of Columbia bucket shop law); Fletcher v. United States, 42 App.D.C. 53 (1914) (conspiracy wrongfully to accuse a woman of unchastity and to commit perjury); Arnstein v. United States, 54 App.D.C. 199, 296 F. 946, cert. denied, 264 U.S. 595, 44 S.Ct. 454, 68 L.Ed. 867 (1924) (conspiracy to bring stolen stock into the District of Columbia); *see* Beard v. United States, 65 App.D.C. 231, 82 F.2d 837, cert. denied, 298 U.S. 655, 56 S.Ct. 675, 80 L.Ed. 1382 (1936) (conspiracy to violate D.C. gambling laws); *cf.* Lee v. United States, 72 App.D.C. 147, 112 F. 2d 46 (1940); Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49 (1956) (conspiracy to commit bribery). In short, it has long been understood and held that the two codes are reciprocal in their operation.

To adopt appellant's construction would lead to an anomalous result, one that Congress could not conceivably have intended. If one killed during the course of a robbery on the street in front of a bank, he could be prosecuted for felony murder under the D.C.Code, but if during the course of a robbery in a bank a killing occurred, that robber could not be prosecuted for felony murder under the D.C.Code. Such a construction must be rejected.

The appellant's argument that our construction will "produce discriminatory, harsh results" is answered by Johnson v. United States, *supra*. As the Supreme Court said (225 U.S. at 418, 32 S. Ct. at 752): "There is certainly nothing anomalous in punishing the crime of murder differently in different jurisdictions. It is but the application of legislation to conditions."

■ Appellant also argues that he was denied equal protection of the laws because of the breadth of the District of Columbia felony murder statute; that is to say, he alleges that it is broader than the coverage of the federal felony murder statute. Whether prosecution is brought in this jurisdiction under the D.C.Code or whether it is brought under an applicable section of the United States Code is a matter confided solely to the discretion of the United States Attorney.

■ Congress was not limited in the D.C.Code specification for first degree felony murder to the felonies set forth in the Federal Code, as pertinent to murder within the special maritime and territorial jurisdiction of the United States, see 18 U.S.C. § 1111. Certainly there would be no constitutional objection to a trial for first degree felony murder in, say, Virginia, if that commonwealth defined that offense to include homicides that were purposeful (though falling short of the premeditated) and were committed in the course of the felony of escape from lawful custody, including homicides, perhaps of bystanders, in the course of the felony of escaping from a Federal marshal. Congress, in legislating for the District of Columbia, had all the powers of the Virginia legislature to legislate concerning homicides occurring within the territorial limits of Virginia, and could go beyond the Federal maritime code.

■ Counsel also attacks the charge in Count 3 for the reason that the trial court did not instruct on all the elements. Particularly, he says that the trial court did not tell the jury that the government was required to prove, among other things, that LaVance Greene was of sound memory and discretion. It is well settled that no allegation of sanity is required in an indictment, nor does the language of Section 2401 of Title 22 of the D.C.Code require that the indictment include the allegation that the defendant was of sound memory and discretion. See Jones v. United States,[3]

3. "Appellant argues that his indictment was defective in that it did not contain the phrase 'being of sound memory and discretion', which is in the statutory definition of first degree murder. Counsel candidly concede the point was decided adversely to them by this court in Hill v. United States. They request reexamination of that case and the later cases in which it has been cited. We have reexamined the matter and are not

111 U.S.App.D.C. 276, 296 F.2d 398, cert. denied, 370 U.S. 913, 82 S.Ct. 1260, 8 L.Ed.2d 406 (1962). See also Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555, cert. denied, 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613, rehearing denied, 369 U.S. 842, 82 S.Ct. 870, 7 L.Ed.2d 847 (1962). In *Coleman,* the defendant was convicted of first degree felony murder. Counsel attacked the indictment for the reason that it did not contain the statutory allegation that the defendant was of sound memory and discretion. He recognized that such a contention had been specifically rejected by this Court in the *Hill* (Hill v. United States) case, 22 App.D.C. 395, 400–402.[4]

In United States v. Green, 150 U.S. App.D.C. 222, 463 F.2d 1313 (1972), in footnote 5, we affirmed what we held in *Hill* and *Coleman, supra.*

The trial court in instructing the jury on the elements of felony murder (Tr. 985) set them forth clearly and explicitly. There is in the record ample evidence to support the jury's finding of guilty.

### III.

### INSANITY AS A DEFENSE

Appellant attacks Section 207(6) of the District of Columbia Court Reform and Criminal Procedure Act of 1970, P. L. 91–358, which added a new sentence at the end of 24 D.C.Code § 301(j), so as to place the burden upon a defendant asserting insanity as a defense to prove this defense by a preponderance of the evidence. Section 301(j), as amended, provides:

> Insanity shall not be a *defense* in any criminal proceeding in the United States District Court for the District of Columbia or in the Superior Court of the District of Columbia, unless the accused or his attorney in such proceeding, at the time the accused enters his plea of not guilty or within fifteen days thereafter or at such later time as the court may for good cause permit, files with the court and serves upon the prosecuting attorney written notice of his intention to rely on such defense. No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his insanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence. (Emphasis supplied.)

This case presents no ex post facto question, as the provision became effective February 1, 1971, prior to the September 24, 1971, date of the homicide in this case.

■ Appellant's first attack on the statute in question is that it applies only to insanity and not to productivity. He is clearly wrong in this for the reason that the Act is addressed to the defense of insanity, which, in this jurisdiction, at the time of the offense charged in this indictment, was a unitary concept which required proof of insanity and productivity.[5]

---

persuaded to change the ruling. The statutory definition is the common-law definition as given by Blackstone and by Coke. In this jurisdiction it was held by Judge Cox in Guiteau's Case that the quoted phrase means merely 'a responsibly sane mind'. The Hill case, supra, was followed in others. An allegation of sanity is not required in an indictment." 111 U.S.App.D.C. at 283–284, 296 F.2d at 405.

4. "There, the court pointed out, the District of Columbia had taken the common law of Maryland in 1801, and since had followed it. The definition of murder found in the Code in 1903 was that of the common law, and it was 'not necessary, in any view of the case, to charge that the accused was of sound

mind and discretion, as essential to the validity of the indictment.' The view then expressed, unimpaired by any holding of this court over the intervening years, must be considered also in light of the fact that we are treating here of felony-murder." Coleman v. United States, 111 U.S.App.D.C. at 213, 295 F.2d at 558.

5. The rule in effect at the time of trial was that of Durham v. United States, 94 U.S. App.D.C. 228, 214 F.2d 862 (1954) and McDonald v. United States, 114 U.S.App.D. C. 120, 312 F.2d 847 (1962), which has since been superseded by United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972).

Appellant next argues that the Act is unconstitutional on its face. In reliance upon our decision in United States v. Thompson, 147 U.S.App.D.C. 1, 452 F.2d 1333, cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972), appellant seeks to demonstrate that since a different standard of proof concerning the defense of insanity is provided by Section 207(6) of the Court Reform Act than is applicable in other federal jurisdictions, that the Act amounts to a denial of equal protection. The *Thompson* case was concerned with two standards, each enunciated by Congress, each applicable to bond pending appeal. We decided that insofar as D. C.Code offenses are concerned the standard enunciated in the Court Reform Act and applicable specifically to the District of Columbia should apply, and that the standard enunciated by Congress insofar as federal offenses are concerned, should apply to those offenses.

The District of Columbia is unique in our constitutional system. *See* District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). This accounts for the unique situation in which jurisdiction over criminal violation of the District of Columbia Code is vested concurrently both in the Superior Court of the District of Columbia, a statutory court established pursuant to Article I, see Palmore v. United States, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (Apr. 24, 1973), and in the United States District Court for the District of Columbia, a constitutional court established under Article III of the Constitution.

The provision of the Court Reform Act making its provisions relating to the defense of insanity applicable to offenses committed in the District of Columbia, clearly has application to the counts charging first degree felony murder in violation of 22 D.C.Code § 2401—count 2 (felony murder committed while perpetrating a robbery) and count 3 (felony murder committed while perpetrating the crime of rescuing a federal prisoner)—whether those crimes are prosecuted in the United States District Court for the District of Columbia or in the Superior Court of the District of Columbia.

We continue to put to one side, as we did in *Brawner*, whether those provisions were intended to or can have application to a prosecution in the District Court of a violation of Title 18 of the United States Code, which is intended for enforcement throughout the Federal court system. In enacting local criminal statutes in the exercise of its singular constitutional responsibility to legislate for the District, Congress need not hew to the same path it elects in defining criminal offenses of nationwide applicability, pursuant to its Federal legislative powers. Thus viewed, we find no inconsistency whatever in applying to a D.C. Code offense—albeit tried in the United States District Court—a standard of proof different from that of a Federal offense tried, for example, in the District Court for the Southern District of New York. Indeed, it would be more anomalous for one standard, at least of a substantive or crucial nature, to be applied when a D.C.Code offense is tried in the Superior Court and another when the same offense is tried in the District Court. Section 207(6) obviates this by providing that a single rule of insanity shall apply to all D.C.Code offenses, regardless of the tribunal before which they are tried. We cannot accept appellant's suggestion that this works a denial of the equal protection of the laws.

Appellant also contends that Section 207(6) of the Court Reform Act amounts to a denial of due process. We find this contention equally without merit.

The Supreme Court in Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L. Ed. 1302 (1952), sustained an Oregon statute which required a defendant asserting insanity as a defense to prove that defense beyond a reasonable doubt. Here, Congress, in its exclusive constitutional authority to legislate for the Dis-

trict of Columbia,[6] has required that a defendant asserting insanity as a defense prove such defense by a preponderance of the evidence. Congress was concerned that potentially dangerous offenders who successfully pleaded insanity as a defense might be released again to commit offenses without receiving adequate psychiatric treatment. To establish the defense of insanity prior to the Court Reform Act, it was required only that "some evidence" of insanity be shown.[7] Thereafter, it was incumbent upon the government to prove beyond a reasonable doubt either that the defendant was not suffering from a mental disease or defect or, if he were, that the criminal act was not the product of the mental illness.

The difficulty which arose and which was recognized by this Court in a number of decisions was that one mandatorily committed under the provisions of Title 24, Sections 301 et seq., of the D.C. Code could be committed to a mental institution simply because the government had failed to prove sanity beyond a reasonable doubt. Judge Fahy, in his concurring opinion in Ragsdale v. Overholser, 108 U.S.App.D.C. 308, 281 F.2d 943 (1960), expressed doubt about whether confinement in a mental institution can be predicated upon what may be nothing more than a jury's finding of reasonable doubt concerning a defendant's mental condition.[8] In Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968), this Court recognized the consequences of this situation and required that one found not guilty by reason of insanity should be given a hearing promptly after his commitment following a verdict of not guilty by reason of insanity. It was this decision, the legislative history of the Court Reform Act reflects,[9] that motivated Congress to specify that insanity is an affirmative defense and that one asserting it must prove it by a preponderance of the evidence.

Reliance by appellant on the proposition that In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), has, in effect, overruled Leland v. Oregon, *supra,* is misplaced. In re Winship did

---

6. Art. I, Sec. 8, Clause 17.

7. Davis v. United States, 160 U.S. 469, 16 S. Ct. 353, 40 L.Ed. 499 (1895); Durham v. United States, 94 U.S.App.D.C. 228, 214 F. 2d 862 (1954); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (en banc).

8. "It is by no means clear that society can continue to deprive a person of liberty by attributing to a jury's doubt about his mental condition, which led to his acquittal and mandatory commitment, any and all evil or criminal propensities he may be thought to have, and to keep him in confinement because of them." 108 U.S.App.D.C. at 315, 281 F.2d at 950.

9. "This ruling [Bolton v. Harris, 130 U.S. App.D.C. 1, 395 F.2d 642 (1968)] permits dangerous criminals, particularly psychopaths, to win acquittals of serious criminal charges on grounds of insanity by raising a mere reasonable doubt as to their sanity and then to escape hospital commitment because the government is unable to prove their insanity following acquittal by a preponderance of the evidence. The result is a revolving door which, as now Chief Justice Burger explained in rejecting such an outcome in Overholser v. O'Beirne, [112 U.S.App.D.C. 267, 276, 302 F.2d 852, 861 (1961)] allows defendants "to have it both ways"—to escape both conviction and commitment to a hospital.

"The Committee considers this result intolerable. It neither protects the public safety nor provides treatment for a defendant acquitted of a crime on grounds of insanity.

"The court in *Bolton* objected to the fact that under existing law, a reasonable doubt as to sanity served as a basis for mandatory hospitalization until recovery. To meet this objection and to protect the public safety, the Committee has changed existing law to require that at trial a defendant's insanity be established *affirmatively by a preponderance of the evidence.*

"Once a defendant's insanity is established by a preponderance of the evidence and he is acquitted of the charge, there is no need for the post-trial hearing required by *Bolton.* Subsection (d) therefore, has been amended to provide for the mandatory commitment of such a defendant without a hearing until such time as he is either certified by the hospital and found by the court to be recovered or establishes his recovery in court after filing the appropriate motion. (Emphasis supplied.) H.R.Rep. No. 91–907, 91st Cong., 1st Sess. 74 (1970).

not involve insanity as a defense. Winship involved proof of facts—"the occurrence of an event"—while insanity deals with proof of "mental condition and propensity." United States v. James Brown, 478 F.2d 606 at 609 (January 8, 1973). It required that the elements of a juvenile offense be proved beyond a reasonable doubt. This had previously been made clear in the *Gault* case, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), but the Court of Appeals of New York had affirmed a decision consistent with the New York statute that a juvenile could be found "involved" by a preponderance of the evidence. Since "involvement" authorized substantial deprivation of liberty by confinement, the Supreme Court reversed. To support his conclusion, counsel for the appellant relies on United States v. Eichberg, 142 U.S.App.D.C. 110, 439 F.2d 620 (1971). There, a conviction of forgery and uttering was affirmed. The *per curiam* decision held that "ordinarily, 'in view of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments' the jury's verdict must stand." 142 U.S. App.D.C. at 111, 439 F.2d at 621. In a separate concurring opinion, Chief Judge Bazelon, citing In re Winship, *supra*, questioned the continued vitality of *Leland:* It is noted, however, that the Supreme Court's opinion in *Winship* cited with approval a group of prior decisions, including Leland v. Oregon.

 The essential elements of the charge of felony murder do not include proof of sanity. If that were the case, the Government would be required to produce evidence establishing sanity beyond a reasonable doubt as part of its direct case, before the defendant introduced an iota of testimony, and that is not and never has been the law. The elements of felony murder applicable to Count 3 are that a felony was attempted or being perpetrated and that during the course of that action the deceased was purposely killed. As to the meaning of purposely, see Collazo v. United States, 90 U.S.App.D.C. 241, 246, 196 F.2d 573, 578, cert. denied, 343 U.S. 968, 72 S.Ct. 1065, 96 L.Ed. 1364 (1952). See also *Coleman, Jones,* and *Green, supra.* In determining whether Leland v. Oregon is modified or overruled by In re Winship, consideration should be given to the more recent case of Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), in which the Court held that it was consistent with due process to determine the voluntariness of a confession by a preponderance of the evidence rather than by proof beyond a reasonable doubt. Here, since sanity is not one of the elements of felony murder but lack of sanity may be interposed as a defense, Congress may with propriety enunciate the standard of proof required of the party asserting this affirmative defense, i. e., proof by a preponderance of the evidence. That is the situation, at least unless and until *Leland* is overruled.

The scope and reach of the *Winship* case was one of the issues confronting the Second Circuit in United States v. Braver, 450 F.2d 799 (2d Cir. 1971). There, appellant challenged the trial court's instructions regarding the defense of entrapment. The trial judge had followed the rationale of Judge Learned Hand in United States v. Sherman, 200 F.2d 880 [10] (2d Cir. 1952), in which it was stated that on the issue of inducement the defense has the burden. In affirming the conviction and explaining its understanding of *Winship*, the Second Circuit at page 803 of *Braver* held that placing the burden of proving inducement on the defendant does not constitute a denial of due process. "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364, 90 S.Ct. at 1073.

---

10. Cited in Hansford v. United States, 112 U.S.App.D.C. 359, 364, 303 F.2d 219, 224 (1962).

**1156**

In Phillips v. State, 86 Nev. 720, 475 P.2d 671 (1970), cert. denied, 403 U.S. 940, 91 S.Ct. 2260, 29 L.Ed.2d 719 (1971), the Supreme Court of Nevada rejected the argument that In re Winship changes the concept that one asserting the affirmative defense of insanity must prove insanity by a preponderance of the evidence.

> Whether sanity is an element of the crime of murder which must be proven by the state is a question that has been well-settled. Insanity is an affirmative proposition which the defendant must establish by a preponderance of proof. Gallegos v. State, 84 Nev. 608, 446 P.2d 656 (1968). Appellant is in error when he asserts that In re Winship, . . . recently decided, changes that concept.

475 P.2d at 672.

It is noted that only two of the Justices of the Supreme Court voted to review the case. 403 U.S. 940, 91 S.Ct. 2260.

For seventy-five years Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), has been recognized in the federal courts as authority for the proposition that when evidence of insanity is present for the consideration of the jury that it is incumbent upon the prosecution to establish beyond a reasonable doubt that the defendant was responsible criminally for his acts.[11] Here, the charge is felony murder, not common law murder, and accordingly, no proof of premeditation, deliberation, and malice is required. If the killing was purposely, i. e., intentionally, done during the course of the commission of a felony, or the attempted commission of a felony, the essential elements of felony murder as charged in Count 3 have been proved. Davis in effect confirms our earlier observation that sanity is not an essential element of the offense, for otherwise Davis would have required the prosecution to have proved sanity beyond a reasonable doubt as part of its direct case, whereas the Court merely left the issue as one that does not arise in the case unless there is some evidence of insanity, which typically calls on defendant to make some affirmative presentation. Of even more critical importance is the fact that the Supreme Court enunciated the Davis doctrine as part of its supervisory authority over the federal courts. The Court clearly reflected that no constitutional issue compelled the decision. Since Congress, as part of its constitutional authority over the District of Columbia, has established the rule which was followed by the trial court in the instant case, we recognize that Congress has acted within the bounds of its constitutional authority and the preponderance rule for an affirmative defense is not a denial of due process of law. Again, we say this in the context of Leland v. Oregon as an authoritative and binding precedent, unless modified or overruled by the Supreme Court.

## IV.

## BIFURCATION

In a number of cases this Court has recognized the desirability of bifurcating that portion of a criminal trial which concerns insanity as a defense. The Court has recognized that a considerable degree of discretion must be ac-

---

11. "If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged. His guilt cannot be said to have been proved beyond a reasonable doubt—his will and his acts cannot be held to have joined in perpetrating the murder charged—if the jury, upon all the evidence, have a reasonable doubt whether he was legally capable of committing crime, or (which is the same thing) whether he wilfully, deliberately, unlawfully, and of malice aforethought took the life of the deceased. As the crime of murder involves sufficient capacity to distinguish between right and wrong the legal interpretation of every verdict of Guilty as charged is that the jury believed from all the evidence beyond a reasonable doubt that the accused was guilty, and was therefore responsible, criminally, for his acts." Davis v. United States, 160 U.S. at 488, 16 S.Ct. at 358.

corded the trial court in making its determination on this issue. In Holmes v. United States, 124 U.S.App.D.C. 152, 154, 363 F.2d 281, 283 (1966), we set forth the fundamental rule:

> The court not only has a broad discretion in considering bifurcation, but also in prescribing its procedure, the form of the charge and submission of the questions to the jury, the admissibility of evidence in each stage, and even the impaneling of a second jury to hear the second stage if this appears necessary to eliminate prejudice.

On the facts of this case, and particularly since Randolph Greene did not wish to interpose the defense of insanity, it appears that the trial court's ruling to bifurcate the case had a substantial basis. Additionally, it permitted the defense to call Randolph Greene as a witness in the second stage of the trial without subjecting him to cross-examination on the merits.

There is no showing here that any evidence which counsel wished the jury to consider on behalf of LaVance Greene was excluded either prior to the time the case was submitted to the jury on the indictment or at the bifurcated stage where insanity was the sole issue. Under these circumstances, we see no basis for reversing the determination of the trial court or regarding his decision as an abuse of discretion.

Most of our cases in which the issue of bifurcation has been raised are cases in which the trial judge refused to bifurcate. In footnote 2 in United States v. Grimes, 137 U.S.App.D.C. 184, 421 F.2d 1119 (1969), Judge McGowan, speaking for the Court, considered five cases in which we sustained the discretion of the trial judge in denying bifurcation. There is no intimation in any of these cases that it would have been error to grant bifurcation, nor has it been contended in any of our cases that to do so would have been an abuse of discretion. In Contee v. United States, 133 U.S.App.D.C. 261, 262, 410 F.2d 249, 250 (1969), we said: " * * * the trial court should be alert to the need for separate trials whenever the accused proposes to present an insanity defense regardless of whether defense counsel makes an initial request or an initially sufficient showing of need."

Ordinarily, where the defense on the merits is confined to putting the government to its proof, failure to order bifurcation is not regarded as an abuse of discretion. See Parman v. United States, 130 U.S.App.D.C. 188, 399 F.2d 559, cert. denied, 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126 (1968). However, we have recognized as in United States v. Bennett, 148 U.S.App.D.C. 364, 460 F.2d 872 (1972), that an entire defense may be prejudiced by the intermingling at trial the insanity defense with the defense on the merits. In Bennett's case, the testimony of the government psychiatrist that Bennett had a very good recollection of the events and that he recalled minutely what happened prior to the offense was deemed prejudicial. It is obvious that bifurcation would have been the preferable course in Bennett's case. It is also obvious that a serious question was raised under 18 U.S.C. § 4244 by the admission of such testimony. We held that reversal was required for that and other reasons.

Here, no abuse of discretion has been shown. Additionally, the obvious way to avoid confusion in instructing a jury on the standard of proof required of one interposing insanity as a defense, namely, by a preponderance of the evidence, is to bifurcate the insanity defense.

## V.

### PREMEDITATED MURDER OF A FEDERAL OFFICER

Appellant raises a question whether the procedure followed under the 1970 amendments of the D.C.Code were rightly applied to his trial under 18 U.S.C. § 1114 (count 1), for premeditated murder of a federal officer. The general Federal rule provides that once the defendant has adduced appropriate evidence concerning the insanity de-

fense, the burden is on the government to prove beyond a reasonable doubt that defendant did not have such mental disease in order to prove him guilty of having committed such an offense. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895). A question arises as to whether the *Davis* rule, which was applicable to all other federal district courts, is inapplicable to the United States District Court for the District of Columbia, by virtue of the 1970 amendment to the D.C.Code, when that court is engaged in the trial of an indictment charging violation of a federal murder statute, i. e., 18 U.S.C. § 1114. The question raises serious issues, compare United States v. Thompson, 147 U.S.App.D.C. 1, 452 F.2d 1333 (1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972). We do not think it necessary to decide that issue in this case, however, because of the concurrent sentences for felony murder under the D.C.Code, and accordingly, we think it in the interest of justice to follow the practice set forth in the *Hooper*[12] line of cases, and will vacate the judgment on Count 1. We discern no prejudice to the government and this course obviates the need for ruling in this case on an issue that should be decided only where it is truly material to the controversy.

## VI.

### RESCUE OF A FEDERAL PRISONER IN VIOLATION OF 18 U.S.C. § 572(a)

 Appellant attacks the conviction under this section of Title 18 on the same basis as his attack on Count 1 (premeditated murder of a Federal officer). The trial court sentenced the defendant LaVance Greene consecutively under this count.

The sentence imposed by the trial court for the offense of rescue was con-

secutive to the sentence imposed for felony murder and armed robbery. In Blockburger v. United States, 284 U.S. 299, at 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Court set forth the controlling rule:

> Each of the offenses created requires proof of a different element. The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

Here, the charge of felony murder (Count 3) includes every essential fact element of the rescue charge. For the reasons set forth in United States v. Benn, 155 U.S.App.D.C. 180, 476 F.2d 1127 (D.C. Cir. 1972, as amended March 8, 1973), we conclude that there has been a merger between the felony alleged as part of the felony murder in Count 3 and that a consecutive sentence for the felony of rescue is improper and that therefore the conviction of the rescue offense charged in count 5 of the indictment should be vacated.

## VII.

### ARMED ROBBERY CONVICTIONS

LaVance Greene's four armed robbery convictions, as a result of which he was given a concurrent sentence of 15 years to life, followed adequate instructions by the court on the essential elements of these offenses and are predicated upon clear evidence appearing in the record and since they are local offenses, the defense of insanity is controlled by the recent act of Congress to which reference has been made previously. The armed robbery counts are affirmed.

---

12. United States v. Hooper, 139 U.S.App.D.C. 171, 432 F.2d 604 (1970); United States v. Bobbitt, 146 U.S.App.D.C. 224, 450 F.2d 685 (1971); United States v. Fishbein, 446 F.2d 1201, 1205–1206 (9th Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 683, 30 L. Ed.2d 667 (1972).

## VIII.

### ESCAPE

▇▇ Randolph Greene, the prisoner from Lewisburg Penitentiary who received permission to come to Washington under guard to attend his father's funeral, challenges his conviction of escape under section 751 of Title 18, United States Code. He affirmatively stated in open Court that he did not wish to have his counsel interpose the defense of insanity. He challenges his conviction, however, on two separate grounds. First, the government was permitted to show that he had on a prior occasion attempted to escape from confinement. It has long been recognized that one's motive, design, or intent may be shown by reference to prior criminal conduct not charged in the indictment. See Drew v. United States, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), and United States v. Bobbitt, 146 U.S.App.D.C. 224, 450 F.2d 685 (1971). Randolph Greene's other objection is that he was coerced to go with his brother who was armed and directed him to leave the church and to go up the street. He states that his act in leaving the church was not voluntary and in support of that relies on the testimony of one witness who said there was nothing else he could do, and another witness who says he heard him say: "My God, man, not this." Evidence to the contrary, relied on by the government and accepted by the jury, shows that when one of the marshals seated near Randolph Greene questioned him concerning the identity of the man who came into the church in the middle of the services, went to the casket, and after making the sign of the cross spoke to Randolph Greene's mother before leaving the church. He answered, I don't know; I've never seen him before. That man was the defendant LaVance Greene. When directed to leave the church, the first thing Randolph told LaVance Greene was, "Look out, there's another one of them outside." Further evidence of voluntary participation in the escape was Randolph Greene's question to his brother: "Which way shall we go?" Further evidence to the voluntariness of the act was that Randolph Greene followed after LaVance Greene. In the final analysis, the jury was properly and adequately instructed as to the essential elements of escape and clearly there was evidence on the basis of which the jury was justified in finding Randolph Greene guilty beyond a reasonable doubt.

As to appellant LaVance Greene, the judgments on counts 1 and 5 are vacated, the judgments on counts 3, 7, 9, 11, and 13 are affirmed. The judgment as to Randolph Greene is affirmed.

So ordered.

## ON APPELLANT'S SUGGESTION FOR REHEARING EN BANC

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

### ORDER

Appellant has filed a petition for rehearing *en banc*. On consideration thereof, it is

Ordered by the Court *en banc* that the suggestion for rehearing *en banc* is denied, a majority of the Circuit Judges who are in regular active service not having voted in favor of it (Rule 35, Federal Rules of Appellate Procedure).

Circuit Judges J. SKELLY WRIGHT and SPOTTSWOOD W. ROBINSON, III, would grant rehearing en banc.

### STATEMENT OF CIRCUIT JUDGE LEVENTHAL AS TO WHY HE HAS NOT VOTED TO GRANT REHEARING EN BANC.

LEVENTHAL, Circuit Judge:

Chief Judge Bazelon has prepared an exhaustive statement as to why he would grant rehearing en banc. The issues in this case are not simple, and can be argued both ways. Whether the case

should be heard en banc, however, depends on an appraisal of the basic rulings. The fundamental issue is whether appellant Greene was entitled to have the Government prove his sanity beyond a reasonable doubt. Judge Bazelon is quite right in saying that this poses a substantial issue of due process. However, orderly resolution of that issue is furthered if this intermediate appellate court applies the only direct Supreme Court precedent, Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1951), leaving the way open for appellant to apply to the Supreme Court to obtain reconsideration of that precedent, and assessment of its current vitality.

As to the other broad question of equal protection, it should be emphasized that the panel opinion does not, repeat not, hold that a prosecution for U.S.Code crimes will be governed by the new D.C. Code provision shifting the burden to the defendant on the insanity issue.[1] Whether some of the panel rulings are discerned by others to be correct, they are arguable,[2] and relatively narrow, and do not now warrant en banc consideration.

## STATEMENT OF CHIEF JUDGE BAZELON AS TO WHY HE WOULD GRANT REHEARING EN BANC.

BAZELON, Chief Judge:

In large part this case involves questions arising out of the interplay between the District of Columbia (local) Criminal Code, on the one hand, and the United States (federal) Criminal Code, on the other. It also involves a due process challenge to a recent amendment to the D.C.Code requiring a defendant to prove his insanity defense by a preponderance of the evidence.[1]

For disarming several federal marshals, and then shooting one of them as he assisted his brother to escape, La Vance Greene was convicted of two U.S. Code offenses—premeditated murder of a federal officer,[2] and assisting a federal prisoner to escape;[3] he was also convicted of five D.C.Code offenses—felony murder,[4] and four counts of armed robbery.[5] The jury rejected a plea of insanity after being instructed in accordance with the recently enacted D.C. Code provision requiring a defendant to establish his plea by a "preponderance of the evidence."

The court affirms all of appellant's D.C.Code convictions, and vacates all of his U.S.Code convictions. A brief summary of the court's holdings, and my views thereon, which I will address more fully below, are as follows:

I. The court holds that the D.C.Code felony murder statute applies to U.S. Code felonies. (Court's opinion at 1150, 1151.)

In my view:

A. The court's reasons do not support its interpretation of the D.C. Code felony murder statute, and there are strong reasons for limiting the statute to local offenses. (Pp. 1161–1164.)

---

1. This case does not involve the problem of United States v. Thompson, 147 U.S.App. D.C. 1, 452 F.2d 1333 (1971), and I at least would have grave difficulty with an assertion that the legislature could require, in a prosecution under the national criminal code, that one Federal district court must deny important protections granted to defendants by other Federal district courts.

2. The panel holds that assuming the applicable considerations, including the fairness of due process, permit a State to shift to the defendant the burden of showing insanity in a trial for a State offense, the same considerations are applicable when the State (here the District of Columbia) happens to define its criminal offenses in terms of a concomitant intent to violate, or violation of, the criminal laws of another state (or of the Federal Government).

1. P.L. 91–358, § 207(6), amending 24 D.C. Code § 301(j) (1973).

2. 18 U.S.C. § 1114 (1970).

3. 18 U.S.C. § 752(a) (1970).

4. 22 D.C.Code § 2401 (1973).

5. 22 D.C.Code §§ 2901, 3202 (1973). Three of the four armed robbery convictions were for taking guns from the marshals; the fourth was for taking a car in the effort to escape.

B. If the D.C.Code felony murder provision applies to federal offenses, it is a denial of equal protection. (Pp. 1164–1165.)

C. This court's decision in United States v. Canty [6] requires vacation of appellant's D.C. felony murder conviction irrespective of the general application of the D.C. felony murder provision. (Pp. 1166–1165.)

II. The court expressly recognizes that the federal premeditated murder conviction, for which sentence was imposed concurrently with the sentence on the D.C.Code felony murder conviction, raises a serious constitutional question. To avoid this serious issue, it vacates the federal homicide conviction under the *Hooper* doctrine.[7] (Court's opinion at 1157–1158.)

It also vacates the federal conviction for assisting escape because, as the underlying felony of the felony murder conviction, it merges into the felony murder. (Court's opinion at 1158.)

In my view:

A. The court's use of *Hooper* is an improper exercise of appellate discretion. (Pp. 1166–1167.)

B. It is manifestly improper to merge an underlying felony with a felony murder conviction. (Pp. 1168–1169.)

III. The court concludes that it need not decide whether the D.C.Code provision governing the burden of proof on an insanity plea can apply to federal offenses since it has vacated both of appellant's U.S.Code convictions. (Court's opinion at 1153.)

In my view:

A. The court has not vacated *all* of appellant's federal offenses, because it has affirmed his D.C.Code felony murder conviction for a homicide that occurred in the commission of a *federal* offense. (P. 1170.)

B. The court was required to consider the application of the D.C. burden of proof statute to federal offenses even if there were *no* U.S. Code offenses in the present case since the statute applies in "any criminal proceeding in the United States District Court for the District of Columbia," which must include the trial of federal offenses. (Pp. 1170–1174.)

IV. The court finds that the D.C. Code burden of proof statute governing insanity pleas may constitutionally be applied to local offenses. (Court's opinion at 1152–1156.)

In my view:

A. Even if it applied only to local offenses, the D.C. burden of proof statute would be a denial of equal protection. (Pp. 1173–1174.)

B. The D.C. burden of proof statute is a denial of due process. (Pp. 1174–1180.)

## I

Appellant was convicted of felony murder under the D.C.Code for killing a deputy marshal while assisting a federal prisoner to escape in violation of the U. S.Code. The D.C.Code felony murder provision applies to homicides committed in the course of "any offense punishable by imprisonment in the penitentiary." The court finds that the words "any offense" were intended to include federal offenses, and that the statute so construed is not a denial of equal protection. It also fails to consider United States v. Canty,[8] which requires vacation of appellant's local felony murder conviction irrespective of the applicability or *constitutionality of the D.C.Code felony murder statute.*

## A. STATUTORY ANALYSIS

Until passage of the District of Columbia Court Reorganization Act of

---

6. 152 U.S.App.D.C. 103, 469 F.2d 114 (1972).

7. United States v. Hooper, 139 U.S.App.D.C. 171, 432 F.2d 604 (1970).

8. 152 U.S.App.D.C. 103, 469 F.2d 114 (1972).

1970,[9] all felonies committed in D.C., both local and federal, were tried in the federal district court.[10] The 1970 Act created a court system "comparable to those in the States, separate and apart from the [federal court system]."[11] And the Supreme Court has stated that the local court system was established in order "[to] handle criminal cases only under statutes that are applicable to the District of Columbia *alone*," and, therefore, a defendant tried in this jurisdiction is "no more disadvantaged . . . than any other citizen of any of the 50 States who is tried for a *strictly local crime*." Palmore v. United States, 411 U.S. 389, 407, 410, 93 S.Ct. 1670, 1681, 1682, 36 L.Ed.2d 342 (1973) (emphasis supplied). Thus, the Court has made it plain that the Court Reorganization Act contemplates two separate court systems, each administering a separate code.

Nevertheless, this court fails to consider this critical history of the Court Reorganization Act, and contrary to *Palmore*, concludes that the two codes were generally intended to "mesh with each other." It rests on the following three assertions.

First, it says:.

"The Federal Criminal Code embodied in Title 18 and the District of Columbia Code of Title 22 were both enacted by Congress and were intended to exist together. Johnson v. United States, 225 U.S. 405 [32 S.Ct. 748, 56 L.Ed. 1142] (1912)." (Court's opinion at 1150.)

The court's claim that the two codes were intended to "exist together," and its citation to *Johnson*, the case from which those words were taken, is plainly misleading since *Johnson* stands for the proposition that the two codes are "separate instruments" that are *not* intended to mesh with each other. *Johnson* involved a challenge to the original D.C.

Code, which was enacted in 1901,[12] on the ground that its homicide provision did not allow juries to prohibit capital punishment in murder cases. The United States Criminal Code, which was enacted in 1909,[13] did permit juries to nullify capital punishment. Johnson claimed that the U.S.Code was intended to modify the D.C.Code since the original D.C.Code, still in force at the time of Johnson's case in 1912, provided that "so far as [future] acts [of Congress] may vary from or conflict with any provision contained in this code, they are to have effect as subsequent statutes and as repealing any portion of this act inconsistent therewith."[14] The Court rejected this argument because "Congress certainly in enacting the [1901] District Code, recognized the expediency of separate provisions for the District of Columbia," and "[h]aving *definite territorial operation*, [the U.S. and D.C. Codes] can *exist together*." 225 U.S. at 418–419, 32 S.Ct. at 752, 753 (emphasis supplied). As a general principle, the Court concluded:

> the effect of separation is important and necessarily had its purpose. The codes had in the main special spheres of operation and provisions accommodated to such spheres. 225 U.S. at 417, 32 S.Ct. at 752.

Thus, *Johnson* strongly undercuts this court's conclusion that the two codes were intended to *mesh*. On the contrary, it indicates that long before *Palmore*, indeed since the inception of the two codes, they have been viewed as separate and independent instruments. This court ignores the *Johnson* holding, and simply lifts two words—"exist together"—from the decision, and cites them wholly out of context.

The court's second assertion is:

"We believe further that [the two codes] were intended to mesh with each other, and that they have been so

---

9. P.L. 91–358, 84 Stat. 473.

10. 11 D.C.Code § 521 (1967).

11. H.R.Rep.No.91–907, 91st Cong., 2nd Sess. 5 (1970).

12. 31 Stat. (Ch. 854) 1189, 1321–1337.

13. 35 Stat. (Ch. 321) 1088.

14. 31 Stat. 1436 at § 1639.

construed in the past. [Citations omitted.]" (Court's opinion at 1150.)

The court relies solely upon some early cases in this Circuit which held that the federal conspiracy statute could charge conspiracies to violate the D.C.Code as well as conspiracies to violate the federal code.[15] It implies that because this one section has been held to apply across the two codes, Congress generally intended them to mesh. The D.C.Code felony murder provision, however, has been in effect for over seventy years, and the court cites no case, nor have I been able to find any case, in which it has been applied to a federal offense.

Moreover, application of the federal conspiracy statute to local offenses filled an important need: conspiracies to violate the provisions of the D.C.Cőde would otherwise have gone unpunished, because prior to the Court Reorganization Act of 1970[16] the D.C.Code lacked a general conspiracy section. No such lacuna has ever existed with respect to the homicide sections of the two codes.[17] Indeed, appellant was convicted under both the local felony murder provision, and the federal premeditated murder statute, for the same killing.

Finally, application of the federal conspiracy statute to local offenses raises no serious equal protection issues since the result is solely to allow punishment for those who conspire to violate the D.C. Code. In effect, Congress enacted a local conspiracy statute and placed it in the federal code. Since Congress has not punished such conspiracies differently under any other provision there is

no potential constitutional infirmity. Application of the D.C.Code felony murder provision to U.S.Code offenses, on the other hand, raises a serious equal protection problem that will be discussed below.[18]

Finally, the court asserts:

"To adopt appellant's construction would lead to an anomalous result, one that Congress could not conceivably have intended. If one [committed a killing] during the course of a robbery on the street in front of a bank, he could be prosecuted for felony murder under the D.C.Code, but if during the course of a robbery in a bank a killing occurred, that robber could not be prosecuted for felony murder under the D.C.Code." (Court's opinion at 1151.)

I assume the court is claiming that it would be anomalous to hold the D.C. felony murder statute applicable to all robberies committed in D.C. except bank robberies. Congress, however, has made it a federal crime—applicable in D.C. as well as every other jurisdiction—to commit a homicide in the course of any bank robbery.[19] There is nothing anomalous about punishing, on the one hand, purely local robberies (and any homicides that occur in the course of their commission) under the D.C.Code, and, on the other hand, punishing those robberies and homicides that are of national concern under the U.S.Code, even if they all take place in the District of Columbia.

On the contrary, it is the court's interpretation of the D.C. felony murder

15. *See* cases cited in court's op. at 1150–1151. The rationale of these cases is that the U.S. Code conspiracy statute applies to those who conspire to commit "any offense against the United States," and that a violation of the D.C.Code is not a crime "against the District, but against the United States." United States v. Cella, 37 App.D.C. 423, 426 (1911), *quoting* Metropolitan R. Co. v. District of Columbia, 132 U.S. 1, 10 S.Ct. 19, 33 L.Ed. 231 (1889). *But cf.* P.L.No.91–358, § 172 (1970), codified at 28 U.S.C. § 1363 ("For purposes of this chapter, references to the laws of the United States or Acts of Congress do not include laws applicable exclusively to the District of Columbia.").

16. P.L. 91–358, § 202, codified at 22 D.C.Code 105a.

17. If the D.C.Code felony murder statute were limited to local offenses, those homicides falling within the explicit coverage of the U.S. Code could be prosecuted thereunder, and *all* other homicides occurring in D.C. could be prosecuted under the D.C.Code.

18. *See* section IB *infra.*

19. 18 U.S.C. § 2113(e) (1970).

statute, not appellant's, that leads to an anomalous result: namely that Congress intended to punish homicides that occur in the course of a bank robbery more severely in D.C. than in the remainder of the country. The D.C. felony. murder statute, which the court holds applicable to federal bank robberies, carries a mandatory life sentence with parole eligibility only after twenty years,[20] whereas the federal bank robbery statute's felony murder provision carries a sentence of ten years to life imprisonment,[21] with parole eligibility after one third of any sentence is served, but in no case beyond fifteen years.[22]

In sum, the court's three assertions simply do not support its conclusion. Indeed, at least the first and third justifications appear to cut the other way. Moreover, the court ignores our opinion in United States v. Thompson, 147 U.S. App.D.C. 1, 452 F.2d 1333 (1971). There, appellant had been convicted of two U.S.Code violations in this jurisdiction, and was seeking release pending appeal. He argued that his petition for release should be governed by the federal bail statute.[23] The government urged that it be judged under the harsher standards of the D.C.Code bail statute which applies to anyone "convicted of . . . *any criminal offense* committed in the District of Columbia . . . in violation of an Act of Congress." [24] We held that this provision was intended to apply only to those convicted of *D.C. Code offenses*. Thus, the court's decision in this case violates the spirit, if not the holding, of *Thompson*.

## B. EQUAL PROTECTION

Reading the D.C. felony murder statute to include U.S. felonies raises a serious equal protection issue that the court simply fails to confront.[25] In the court's view, Congress intended to punish someone who kills a federal marshal while escaping (or assisting another to escape) in the District of Columbia under the D.C.Code felony murder statute, as well as under the federal murder and escape statutes, whereas in every other jurisdiction Congress intended to punish exactly the same conduct solely under the two federal statutes, neither of which has an applicable felony murder

20. 22 D.C.Code § 2404 (1973).

21. 18 U.S.C. § 2113(e) (1970).

22. 18 U.S.C. § 4202 (1970).

23. 18 U.S.C. § 3148 (1970).

24. 23 D.C.Code §§ 1325(c), 1331(2) (1973) (emphasis supplied).

25. The court does consider a different equal protection argument, raised by appellant, to the effect that the D.C.Code felony murder statute is a denial of equal protection because it applies to homicides committed during "any offense," whereas the U.S.Code felony murder provision, applicable in "the special maritime and territorial jurisdiction" of the United States, is limited to four felonies—rape, arson, burglary and robbery. The court rejects this argument, apparently relying upon the following analysis: (1) Virginia could enact a felony murder statute that applies to all homicides, including those committed during a federal offense; (2) Congress, legislating for the District of Columbia, has the same powers as the Virginia legislature; (3) therefore, the D.C. felony murder statute is valid.

This syllogism indicates that the court misunderstands appellant's equal protection challenge. In the hypothetical constructed by the court, the Virginia legislature enacted a *single* felony murder statute. The gravamen of appellant's claim, on the other hand, is that Congress lacks adequate justification for enacting *two different* felony murder statutes, one for D.C., and one for the special maritime and territorial jurisdictions.

Although I am not persuaded by the court's analysis, I do agree with its conclusion that this particular equal protection claim is without merit. The federal maritime and territorial jurisdiction is limited to "the high seas," "forts," "U.S. aircraft," etc. 18 U.S.C. § 7 (1970). For these areas Congress has enacted a skeletal set of substantive criminal provisions, and therefore a limited felony murder statute. For D.C., however, Congress has enacted a broad code of offenses to deal with a more complex set of criminal problems, and therefore has also enacted a wider-reaching felony murder statute. Accordingly, there is no denial of equal protection. .*See* Coleman v. United States, 118 U.S.App.D.C. 168, 334 F.2d 558, 565 (1964). *Compare* United States v. McDonald, 156 U.S.App.D.C. 338, 481 F.2d 513, 518 (1973) (Bazelon, C. J., dissenting).

provision.[26] As a result, Congress has imposed a *mandatory* sentence of twenty years to life in D.C. for the same conduct as to which it has imposed a sentence ranging from "any term of years" to a *maximum* of fifteen years to life in every other jurisdiction.[27]

In *Thompson, supra,* we held that when Congress establishes "discriminatory classifications affecting District residents" with respect to federal crimes, equal protection requires that "the justification offered must actually be *convincing.*" 452 F.2d at 1341 (emphasis in original). Yet this court does not suggest even a colorable legislative justification for imposing greatly disparate sentences for the same conduct.[28] The simple fact—one that apparently eludes the court—is that the *only* reason to apply the D.C.Code to conduct that has already been made criminal under the U.S.Code is to increase sentences solely for those who commit their crimes in this jurisdiction.[29]

## C. UNITED STATES v. CANTY

Even if the D.C. felony murder statute may validly include federal offenses, our decision in United States v. Canty, 152 U.S.App.D.C. 103, 469 F.2d 114 (1972), which the court ignores, requires dismissal of appellant's D.C.Code felony murder conviction.[30] In *Canty,* the defendant committed a bank robbery while armed. He could have been charged with violating section "d" of the federal bank robbery statute (bank robbery while armed),[31] which carries a twenty-five year maximum sentence. Instead, he was charged with simple bank robbery under the federal statute,[32] which carries a twenty year maximum sentence, and assault with a deadly weapon under the D.C.Code,[33] which carries a ten year maximum. In

26. *Compare* 18 U.S.C. § 2113(e) (1970) (felony murder provision for homicides committed during bank robberies).

27. Under the D.C.Code, the sentence for felony murder is twenty years to life imprisonment. 22 D.C.Code § 2404. The same homicide, if charged under the U.S.Code, would either be: (1) first degree premeditated murder, which carries a sentence of fifteen years to life, 18 U.S.C. §§ 1111, 4202; (2) second degree murder, which is punishable by any term of years to life imprisonment, 18 U.S.C. § 1111, with parole eligibility after one third of any sentence but in no case more than fifteen years, 18 U.S.C. § 4202; or (3) voluntary manslaughter, which carries a maximum sentence of ten years, 18 U.S.C. § 1112, with parole eligibility after one third of any sentence. 18 U.S.C. § 4202. *See* p. 1168 & n. 45 *infra.*

28. To the extent the court relies on the argument that the Virginia legislature could include federal offenses in its felony murder statute, therefore Congress can include them in the D.C. felony murder statute, *see* note 25 *supra,* its reliance is misplaced. If Congress is to penalize a crime of *nationwide* applicability more severely in this jurisdiction than in every other state, it needs a strong justification. *Thompson, supra.* The analagous situation with respect to the Virginia legislature would be if it punished robbery by a ten year sentence in every county in the state save one—which, incidentally, was not represented in the state legislature—and in that

county it imposed a twenty year sentence. *See also* pp. 1173–1174 *infra.*

29. A sharply divided Supreme Court, relying on the doctrine of "separate sovereigns," held that a state could impose a greater sentence than Congress for conduct that it proscribed by the federal code, and that a prosecution under the U.S.Code does not bar a subsequent state prosecution. Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). However, we have explicitly recognized that the doctrine of separate sovereigns "has no application here, since the [federal] statute and the District of Columbia Code have both been enacted by the same sovereign—the federal government." United States v. Canty, 469 F.2d 114, 128–129 n. 20 (1972) and cases cited therein. *See also* Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970) (prosecution under municipal ordinance bar to subsequent prosecution under state statute since state and municipality are same sovereign).

30. *Canty* was informed largely by equal protection considerations similar to those discussed in section IB *supra,* although it did not explicitly rest on that ground.

31. 18 U.S.C. § 2113(d) (1970).

32. 18 U.S.C. § 2113(a) (1970).

33. 22 D.C.Code § 502 (1973).

sum, by going outside the federal bank robbery statute, and charging in part under the D.C.Code, the government was able to increase the defendant's potential maximum sentence from 25 to 30 years. We vacated the D.C.Code assault conviction, holding that the government is prohibited from "venturing outside the federal scheme," and thereby "circumvent[ing its] carefully crafted hierarchy of penalties." 469 F.2d at 128.

In the present case, appellant was charged with one count of premeditated murder under the federal code, which carries a mandatory sentence of 15 years to life, and also one count of felony murder under the D.C.Code, which carries a mandatory sentence of 20 years to life. The federal homicide statute, like the federal bank robbery statute in *Canty*, is carefully subdivided to cover varying degrees of the same offense; it includes two degrees of murder, two types of manslaughter, and attempted murder and manslaughter, and each crime carries a different penalty. Hence, the only reason for the government to go outside this "carefully crafted federal scheme," and charge under the D.C. Code, was to increase appellant's minimum sentence by at least five years.[34] *Canty* prohibits this.[35]

---

The court affirms appellant's D.C. Code felony murder conviction without discussion of (1) a grave equal protection problem, (2) the Court Reorganization Act, (3) the Supreme Court's decision in *Palmore*, and (4) our decisions in *Thompson* and *Canty*—all of which require dismissal of the D.C.Code felony murder conviction. Moreover, it does so gratuitously since appellant was also convicted of premeditated murder under the federal homicide statute for the same killing, and the sentences on the D.C. and federal murder convictions were imposed concurrently. In the face of all this, one must wonder why this court pursued the course it did. I think we can glean some light from parts V and VI of its opinion.

## II

In part V, the court concludes that it has the discretion to vacate appellant's federal premeditated murder conviction under the *Hooper* doctrine.[36] *Hooper* is a judicially created doctrine of appellate discretion allowing vacation of a conviction raising "an issue not governed by controlling precedent," when the sentence imposed on it is concurrent with a sentence on a valid conviction. 432 F.2d at 606. In this case, the sentence on the federal premeditated murder conviction was concurrent with the sentence on the D.C. felony murder conviction, and the court found that the federal conviction "raises serious issues." [37] In part VI, the court holds that it is required to vacate the federal conviction for assisting escape because it was the underlying felony of the D.C. felony murder conviction, and therefore merges into it.

Thus, by affirming the D.C.Code felony murder conviction, the court believes that it is able to vacate both of appellant's federal convictions. This affirm-

---

34. Indeed, appellant's sentence could have been increased by considerably more than five years since what might otherwise be second degree murder or manslaughter under the U.S. Code could be first degree felony murder under the D.C.Code. *See* note 27 *supra.*

35. If the D.C.Code felony murder provision validly includes federal offenses, it must be applied only to homicides not otherwise covered by the U.S.Code in order to avoid violating *Canty.* For example, if in the course of an escape a felon kills a federal marshal, that killing would not come within the coverage of the D.C.Code felony murder provision since there is a federal statute covering the

killing of marshals. On the other hand, if in the course of an escape the felon kills a bystander, a co-felon or someone else not covered by a federal homicide provision, that homicide would fall within the D.C.Code felony murder statute.

36. United States v. Hooper, 139 U.S.App. D.C. 171, 432 F.2d 604 (1970).

37. The court cites United States v. Thompson, 147 U.S.App.D.C. 1, 452 F.2d 1333 (1971), thereby indicating that the serious issues are equal protection matters. *See* pp. 1172–1173 *infra.*

ance notwithstanding, I think that it was an unwise use, if not an abuse, of discretion to vacate the federal murder conviction, and that it borders on the ridiculous to merge the federal assisting escape conviction into the local felony murder conviction.

## A. THE FEDERAL PREMEDITATED MURDER CONVICTION

Appellant attacked this conviction claiming that application of the D.C. statute—which requires a defendant to establish his plea of insanity by a preponderance of the evidence—to federal offenses tried in this jurisdiction is a denial of equal protection because in every other federal trial the prosecution must prove sanity beyond a reasonable doubt.[38] Acknowledging the power of this argument, the court vacates the federal murder conviction for the reason given in *Hooper* that "[i]t better serves the general interest of the administration of justice if the court limits its resources to the determination of those questions and cases that must be decided, especially in light of the ever-mounting docket that besets this and other appellate courts." 432 F.2d at 606. *Hooper* states, however, that a conviction raising a difficult issue should be vacated only when "no present public interest or need is furthered" by resolution of the issue. The issue that triggered the use of the *Hooper* doctrine in this case is whether the D.C. burden of proof statute can be applied to federal offenses. That issue is bound to recur frequently. By postponing its resolution, and thereby allowing application of the D.C. statute governing burden of proof to trials in our federal district court, we undercut both justice *and* efficiency. Since *many* convictions will be secured under this questionable statute, there will be strong incentive for upholding it

in order to avoid reversals; and, if wholesale reversals are ultimately required, we will suffer the burden of many time-consuming retrials. The simple fact—which again appears to elude the court—is that when the constitutionality of a statute of general application is called into question, justice and fairness require an expeditious resolution.

*Hooperizing* appellant's federal murder conviction can perhaps be viewed as indicative of a strong, albeit misguided, commitment to judicial restraint. That same restraint, however, is not evidenced in other parts of the opinion. Appellant also challenged his grand and petit juries, claiming in part that "young people" were inadequately represented in violation of the federal jury selection statute.[39] Although the court denies this claim because it was not timely raised in the trial court, it proceeds to expound its view that "young persons" should not be considered a cognizable group for jury composition, and concludes:

> We have thought it useful to discuss problems presented by appellant's thesis even though, in view of the lack of timely objection, we do not decide this matter on the merits. (Court's opinion at 1150.)

The court reached out for this issue on an admittedly "inadequate record," and despite the lack of controlling precedent in this jurisdiction and a decision of a Sister Circuit holding "youth" to be a cognizable class for jury selection as a matter of *constitutional* law.[40]

Thus, contrary to *Hooper*, and on an issue that was clearly not before it, the court devoted its "time and energies to the research, and opinion writing, incident to appropriate determination of an issue not governed by controlling precedent." 432 F.2d at 606.

---

38. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

39. 28 U.S.C. §§ 1861 et seq. (1970).

40. United States v. Butera, 420 F.2d 564 (1st Cir. 1970).

## B. THE FEDERAL ASSISTING ESCAPE CONVICTION

Since the sentence imposed for this federal conviction was consecutive to the sentence for the D.C. felony murder conviction, the court was unable to *Hooperize* it in order to avoid deciding the constitutionality of the D.C. burden of proof statute governing insanity as it applies to federal offenses. The court does find, however, that the D.C. "charge of felony murder [while assisting an escape] includes every essential fact element of the [federal assisting escape] charge," and concludes, therefore, that there has been a "merger between the felony alleged as part of the felony murder," and vacates the federal assisting escape conviction. (Court's opinion at 1158.)

The government itself pointed out in its petition for rehearing[41] that this merger was predicated on a wholly erroneous understanding of the felony murder doctrine.[42] At common law, homicides were divided into two categories, murder and manslaughter, with murder requiring a showing of "malice." Any homicide committed in the course of a felony was considered murder because malice could be implied from the commission of the felony.[43] When homicides were further subdivided by statute into first degree murder, second degree murder and manslaughter,[44] the doctrine of felony murder was preserved, and the underlying felony was viewed as providing the "premeditation" and "deliberation" otherwise required for first degree murder, as well as malice, where necessary.[45]

Given this rationale for the felony murder doctrine, it strains credulity to hold that the underlying felony merges into the felony murder.[46] The statute proscribing the underlying felony—robbery, for example—is designed to protect a wholly different societal interest from the felony murder statute, which is intended to protect against homicide.[47]

---

41. The government did not accompany its petition for rehearing with a suggestion for rehearing en banc.

42. *See generally* Arent & MacDonald, The Felony Murder Doctrine, 20 Corn.L.Q. 288 (1935).

43. *See id.* at 288–292.

44. *See generally* Keedy, History of the Pennsylvania Statute Creating Degrees of Murder, 97 U.Pa.L.Rev. 759 (1949); Wechsler & Michael, A Rationale of the Law of Homicide, 37 Colum.L.Rev. 701, 703–07 (1937).

45. Different felony murder statutes require varying degrees of volition ranging from intentional (although not premeditated) homicide to absolute liability for any homicide occurring during certain "dangerous" felonies. *See* Arent & MacDonald, *supra* note 42 at 293–305; Wechsler & Michael, *supra* note 44 at 713–717.

 The D.C. felony murder statute for example, requires that a homicide committed in the course of any felony except rape, arson, burglary or robbery, be "purposeful" [*i. e.*, "intentional"—Collazo v. United States, 90 U.S. App.D.C. 241, 196 F.2d 573, 578 (1952)] for it to be first degree murder. Thus, without the felony murder doctrine, these slayings, if not premeditated, would likely be second degree murder, or perhaps voluntary manslaughter.

Homicides committed during rape, arson, burglary and robbery are felony murders even when committed "without purpose so to do." Hence, these killings might otherwise be any level of homicide, including involuntary manslaughter, or even possibly a non-criminal killing. *See* Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555, 559–561 & 565–566 (1961). The "absolute liability" limits of the D.C. felony murder statute have not as yet been judicially determined. Fuller v. United States, 132 U.S.App. D.C. 264, 407 F.2d 1199, 1229 (1968). *Compare* People v. Stamp, 2 Cal.App.3d 203, 82 Cal.Rptr. 598 (1969), *with* American Law Institute, Model Penal Code § 201.2, and tentative draft #9, comment 4 to § 201.2.

46. A merger traditionally takes place when the greater offense contains all of the elements of—and protects the same interest as— the lesser offense. For example, an assault merges into an assault with a deadly weapon, and an assault with a deadly weapon merges into armed robbery. *See* United States v. Johnson, 155 U.S.App.D.C. 28, 475 F.2d 1297 (1973); United States v. Benn, 155 U.S.App. D.C. 180, 476 F.2d 1127 (1972, as amended Mar. 8, 1973). *See also* note 47 *infra*.

47. When the interest protected by the underlying felony is not distinct from that protected by the homicide, the doctrine of felony murder is inapplicable. Otherwise, all voluntary

The underlying felony is an essential element of felony murder only because without it the homicide might be second degree murder or manslaughter.[48] Clearly, neither manslaughter nor second degree murder merges with any other felony like robbery or assisting a prisoner to escape.[49]

This analysis undoubtedly accounts for the court's failure to cite a single case suggesting that a felony murder and the underlying felony merge.[50] Indeed, it explains why this court has affirmed both the underlying felony and the felony murder in countless cases.[51]

In short, to avoid deciding whether the D.C.Code burden of proof statute governing the insanity plea can be applied to U.S.Code offenses, the court affirms appellant's D.C.Code felony murder conviction, and vacates his U.S.Code convictions for premeditated murder and assisting escape. Thus far, I have tried to show that well-settled judicial doctrine required the court to do the opposite of what it has done: namely, to vacate the D.C.Code felony murder conviction, and decide if the application of the D.C. burden of proof statute to appellant's federal offenses was proper.

The court's failure to adhere to established legal doctrine was by no means inconsequential. Even if the D.C.Code burden of proof provision was properly applied to appellant's federal offenses, the course taken by the court increased his minimum sentence by more than three years.[52] And, if the burden of proof could not be applied to his federal offenses, appellant is entitled to a new trial on the insanity phase of his convictions[53] under a more favorable burden of proof.[54]

The court's tortured course was not only prejudicial to appellant, it was also of no avail. In the following section I will show that even if the court had

---

homicides would be felony murders because an assault always precedes the homicide. But the assault, since it protects the same interest as the completed homicide, merges into the homicide. *See* Arent & MacDonald, *supra* note 42 at 298–99.

48. Second degree murder and manslaughter are lesser included offenses of first degree felony murder. Fuller v. United States, 132 U.S.App.D.C. 264, 407 F.2d 1199, 1229 (1968) (en banc). .

49. *See* United States v. Butler, 149 U.S.App. D.C. 300, 462 F.2d 1195 (1972), where the defendant was indicted for first degree felony murder for a homicide committed during a housebreaking, and for housebreaking. He was convicted of second degree murder (as a lesser included offense of felony murder) and housebreaking, and was given *consecutive* sentences for these two convictions, which we sustained. *See also* Jackson v. United States, 114 U.S.App.D.C. 181, 313 F.2d 572 (1962). *See generally,* Williams v. Oklahoma, 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959) (murder committed during kidnapping, and kidnapping, are separate offenses, and may be sentenced separately).

50. In its petition for rehearing, the government also indicates that it has "been able to find no reported cases which have held that a merger occurs between the felony murder and its underlying felony."

51. *See, e. g.,* Fuller v. United States, 132 U.S.App.D.C. 264, 407 F.2d 1199 (1968); Calloway v. United States, 130 U.S.App.D.C. 273, 399 F.2d 1006 (1968); Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555 (1962); Carter v. United States, 96 U.S.App.D.C. 40, 223 F.2d 332 (1955); Wheeler v. United States, 82 U.S.App.D.C. 363, 165 F.2d 225 (1947).

52. The D.C. felony murder conviction carries a minimum sentence that is five years greater than the minimum sentence on the federal premeditated murder conviction, *see* n. 27 *supra.* The federal assisting escape conviction, vacated by the court, carried a 20 month. *minimum sentence.* Thus, *appellant's* sentence was increased by three years and four months.

53. If the D.C.Code provision governing the burden of proof on insanity pleas could not apply to U.S.Code offenses, appellant was entitled to a retrial on the insanity phase of *all* of his convictions. *See* p. 1170–1171 *infra.*

54. If appellant had been acquitted by reason of insanity on the federal murder charge, he probably would have been sent to Saint Elizabeths for treatment even if his D.C.Code armed robbery convictions were affirmed. *See* Kent v. United States, 119 U.S.App.D.C. 378, 343 F.2d 247, 250 (1965).

been correct in taking each of the steps discussed so far, it was still required to decide whether the D.C. burden of proof statute could apply to federal offenses.

### III

In Part III, the court upholds the application of the insanity burden of proof statute to D.C.Code offenses, and also decides "to put to one side . . . [the questions of] whether those provisions were intended to or can have application to a prosecution in the District Court of [a federal offense]." (Court's opinion at 1153.) It is able to do this, it believes, because it has vacated appellant's federal convictions.

Notwithstanding these vacations, I believe the court was required to consider whether the D.C. burden of proof statute could apply to federal offenses for two reasons: first, because it has wittingly or unwittingly approved the statute's application to a federal offense by affirming appellant's D.C. felony murder conviction for a homicide committed in the course of a *federal* offense; and second, because if the D.C. burden of proof statute cannot constitutionally be applied to federal offenses, the whole statute, including its application to D.C. Code offenses, fails.

### A. D.C.CODE FELONY MURDER WHILE COMMITTING A FEDERAL OFFENSE

The court affirms appellant's D.C. Code felony murder conviction on the ground that the D.C. burden of proof statute can be applied to local offenses. The underlying felony of the felony murder conviction, however, was the *federal* offense of assisting a prisoner to escape; without proof of this federal offense, the felony murder conviction necessarily fails.[55] Thus, it is clear that on this U.S.Code offense appellant had the burden under the D.C. statute to prove his sanity by a preponderance of the evidence.[56]

### B. BASIC PRINCIPLES OF EQUAL PROTECTION

Even without any federal convictions before it, the court was required to consider whether the D.C. burden of proof statute could apply to U.S.Code offenses. Appellant argued first that the statute in plain terms applies to "any criminal proceeding in the District Court," which obviously includes the trial of federal offenses;[57] on this point, the government agreed.[58] Second, he claimed that such a legislative classification is either underinclusive[59] because it does not apply to federal crimes tried in other jurisdictions, or overinclusive[60] because it

---

55. *See* United States v. Williams, 150 U.S. App.D.C. 122, 463 F.2d 958 (1972).

·56. Although the question has never been considered, it seems clear that a defendant acquitted by reason of insanity on the underlying felony cannot also be convicted of felony murder since the underlying felony provides the mental state and intent otherwise needed for first degree murder. *See* p. 1168 *supra.*

57. The statute governing the burden of proof was an amendment to the general D.C.Code provision on the insanity defense, which is applicable "in *any* criminal proceeding in the United States District Court for the District of Columbia or in the Superior Court of the District of Columbia . . . ." 24 D.C. Code § 301(j) (1973) (emphasis supplied). *See also* notes 58, 65, 66 & 67 *infra.*

58. "[S]ection 301(j) would have to be stretched far beyond the breaking point to be held applicable only to local offenses."

59. An under inclusive classification applies only to a part of a group who are similarly situated. *See* Rinaldi v. Yeager, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966) (unsuccessful appellants must reimburse state for transcripts, whereas successful appellants need not); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (sterilization for those who commit larceny, but not for those who commit embezzlement). *See generally,* Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341, 348–50 (1949); Note, Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1084–86 (1969).

60. An over inclusive classification applies not only to those similarly situated, but also to others who are not similarly situated. *See* Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (all persons of Japanese lineage confined due to fear of espionage or sabotage); Carrington v. Rash,

does not apply exclusively to D.C.Code offenses, and that for either reason, it is a denial of equal protection.

In the face of this challenge, the court's decision to "put to one side" the applicability of the D.C. burden of proof statute to federal offenses evidences a misunderstanding of basic equal protection analysis. By claiming that the D.C. burden of proof statute is overinclusive because it applies to federal offenses tried in the District of Columbia, appellant acknowledges that Congress might well be able to enact a burden of proof statute limited to local offenses,[61] unless of course it would be a violation of due process.[62] Congress, however, has chosen to pass a *different* statute. And by

failing to consider the overinclusive aspect of that statute, this court has decided to "make a new law, not to enforce an old one"; and "this," the Supreme Court has held, "is no part of our duty."[63] Obviously, every equal protection challenge could be rejected if a court is willing to ignore the existing statutory classification.[64]

By failing to address the equal protection issue, the court forces us to choose between two unacceptable alternatives. Either we can read the D.C. burden of proof statute to apply only to local offenses, or we can hold that its application to federal offenses is not a denial of equal protection. Limiting the statute to local offenses is not only contrary to its language[65] and legislative history,[66]

380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (all members of armed forces prohibited from voting in Texas). *See generally*, Tussman & tenBroek, *supra* note 59 at 351–52; Note, *supra* note 59 at 1086–87.

61. *But see* p. 1173–1174 *infra*.

62. *See* pp. 1174–1180 *infra*.

63. United States v. Reese, 92 U.S. 214, 221, 23 L.Ed. 563 (1875). *See* Kunz v. New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); Aptheker v. Secretary of State, 378 U.S. 500, 515, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); United States v. Robel, 389 U.S. 258, 262, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

The court might just as well have said that the D.C. statute does apply to federal offenses in this jurisdiction, and "put to one side" the question of whether the statute applies to federal offenses in other jurisdictions, and thereby frustrate appellant's contention that the statute was under inclusive. While this suggestion seems ridiculous because the statute plainly does not apply to federal offenses in other jurisdictions, it is equally ridiculous to ignore its application to federal offenses in this jurisdiction, since the statute plainly does apply to them. *See* notes 58 & 59 *supra*, and 65 & 66 *infra*.

64. *Compare* Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). The *statute at issue* there allowed sterilization of a felon who had committed two or more crimes "amounting to felonies involving moral turpitude." Crimes of moral turpitude included, *inter alia*, larceny, but not embezzlement. The Court could have held that the state can sterilize those who repeatedly commit larcenies, *compare* Buck v. Bell, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927),

and "put to one side" the question of whether the statute applied to embezzlers, since appellant, himself, had no embezzlement convictions. Instead, the Court recognized that the statute did not apply to embezzlers, and *therefore* it was a denial of equal protection because "[w]e have not the slightest basis for inferring that [the line between larceny and embezzlement] has any significance in eugenics, nor that the inheritability of criminal traits follows the neat legal distinctions which the law has marked between those two offenses." 316 U.S. at 542, 62 S.Ct. at 1113.

65. The amendment to the D.C.Code governing the burden of proof in insanity pleas does not indicate to which offenses it applies. The section that it amends, however, explicitly applies in "any proceeding" in the District Court as well as the Superior Court. I know of no principle of statutory construction that would allow us to limit the amendment to a different set of offenses than that covered by the section that it amends. Indeed, the court specifically relies on the fact that the amending portion of section 301(j) is to be read as an integrated part of the whole section. Appellant claimed that the amending section—since it speaks in terms of "insanity"—required him to prove only his insanity, and not that the crime was a product thereof. *See* Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954). The court rejects this argument because the statute begins, as it did before the amendment, with "Insanity shall not be a *defense*," and for that reason, the court concludes that the amendment applies to both elements of the insanity defense. (Court's op. at 1152) (emphasis in original).

66. See note 66 on page 1172.

but also leads to the imposition of two different burdens of proof on the issue of sanity[67] when federal and local offenses are joined in federal district court.[68]

On the other hand, holding that the statute may apply to U.S.Code offenses tried in this jurisdiction requires us to find that the "justification offered" by Congress for limiting its application to federal offenses tried in the District is "actually *convincing.*"[69] *Thompson, supra,* 452 F.2d at 1341. The justification offered[70] was our decision in Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968), where we held that the government could not *automatically* commit

for long term treatment those found not guilty by reason of insanity; first, it had to prove by a preponderance of the evidence that they were mentally ill and dangerous at the time of commitment.[71] Congress feared that *Bolton* would allow "dangerous criminals, particularly psychopaths to win acquittals of serious criminal charges on grounds of insanity by raising a mere reasonable doubt as to their sanity and then to escape hospital commitment because the government is unable to prove their insanity following acquittal by a preponderance of the evidence."[72] This reasoning rests on a misapprehension about how the insanity defense has been administered in this jurisdiction.[73] Even if it were a reason-

Moreover, Congress has made it clear that the whole of 24 D.C.Code § 301 is intended to apply to federal offenses tried in the District of Columbia. 24 D.C.Code § 301(h) (1973).

66. *See* H.R.Rep.No.91–907, 91st Cong., 2nd Sess. 73–75 (1970). The reason for the amendment was this court's decision in Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968), which applies to those acquitted by reason of insanity on federal as well as local offenses in this jurisdiction. *See* pp. 1172–1174 *infra.*

67. On federal offenses, the government would have to prove sanity beyond a reasonable doubt, whereas on local offenses, the defendant would have to prove insanity by a preponderance of the evidence. The government argued in its brief that "[s]uch a result cannot reasonably have been intended by Congress." *Compare* United States v. Brown, 157 U.S.App.D.C. 311, 483 F.2d 1314 (1973) (federal bail statute applicable to D.C. offenses tried in federal district court).

68. *See* 11 D.C.Code § 502(3) (1973).

69. Indeed, a classification affecting the insanity defense may require a *compelling* legislative justification. The "convincing justification" test was enunciated in *Thompson,* where the interest at issue was bail pending appeal, which is clearly not of constitutional magnitude. *See* Harris v. United States, 404 U.S. 1232, 92 S.Ct. 10, 30 L.Ed.2d 25 (1971) (Douglas, Circuit Justice). The insanity defense, on the other hand, appears to be constitutionally required. *See* State v. Strasburg, 60 Wash. 106, 110 P. 1020 (1910); Sinclair v. State, 161 Miss. 142, 132 So. 581 (1931); *cf.* United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969, 985–986 (1972). Discriminations with respect to con-

stitutional rights require a "compelling interest." Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right to travel).

70. *See* H.R.Rep.No.91–907, *supra* note 66 at 73–74.

71. We indicated in *Bolton* that an acquittal by reason of insanity is obviously an important consideration in a subsequent commitment hearing because it "may tend to show [that the defendant] meet[s] the requirements for commitment, namely, illness *and* dangerousness." 395 F.2d at 651 (emphasis original).

72. H.R.Rep.No.91–907, *supra* note 66 at 74, quoted at court's op., p. 1154 n. 9.

73. This is so in two respects. First, even when the government was required to prove sanity beyond a reasonable doubt, there were very few successful insanity pleas in cases where the government objected to the plea. Data compiled by the United States Attorney's Office in the District of Columbia indicate that in the seven years preceding the burden of proof amendment there were a total of 23 acquittals by reason of insanity in contested cases, or just over three a year. The data do not indicate which crimes were charged in these cases, hence it is not possible to determine whether these were "serious offenses." Commentators, however, suggest that insanity acquittals are not won in serious cases, particularly murder trials. *See* Chernoff & Schaffer, Defending the Mentally Ill: Ethical Quicksand, 10 Amer.Crim.L.Rev. 505, 510–11 & n. 23 (1972).

Second, it appears that no one acquitted by reason of insanity has been released at a *Bolton* hearing *unless* Saint Elizabeths Hospital recommended release. On the other

able concern, however, it is inadequate as a justification for a classification distinguishing between D.C. and other jurisdictions. In D.C. there is a statutory procedure, applicable to both local and federal offenses, that permits post-trial confinement of those found not guilty by reason of insanity.[74] No such statute applies to federal offenses tried in other jurisdictions, where an accused found not guilty by reason of insanity is *released*.[75] He may, of course, be committed pursuant to a state civil commitment statute,[76] but no state permits long term civil commitment unless the *state* establishes mental illness by at least a preponderance of the evidence.[77] There-

fore, there is no justification, let alone a convincing one, for singling out the District of Columbia, and applying a different burden of proof on federal offenses.

Thus, the court in the present case— by failing to consider the equal protection issue raised by the D.C. burden of proof statute—has forced us to choose in subsequent cases between two wholly unacceptable choices.

## IV

The court finally affirms appellant's D.C.Code felony murder conviction and his D.C.Code robbery convictions, all of which rested on the application of the D.C.Code provision placing the burden

hand, there have been patients denied release by the court despite a Hospital recommendation favoring release. *Cf.* In United States v. Ecker, 156 U.S.App.D.C. 223, 479 F.2d 1206 (1973). In the past year, 57 people were eligible for Bolton hearings. Five people, on the recommendation of the Hospital, were released unconditionally: one had been charged with second degree burglary; one with robbery; one with assault with a deadly weapon; one with possessing and distributing a controlled substance; and one with failure to pay his bill at a rooming house. Another six people, also on the recommendation of the Hospital, were conditionally released: one had been charged with second degree burglary; one with sodomy; one with simple assault; one with assault with a deadly weapon; one with unauthorized use of a vehicle; and one with carrying a dangerous weapon. The other 46 were hospitalized, [These data and conclusions were provided by the staff at John Howard Pavillion, Saint Elizabeths Hospital. By citing them, I do not intend to indicate my approval of the administration of the insanity defense in this jurisdiction. *See* United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969, 1010 (1972) (opinion of Bazelon, C. J.).]

74. 24 D.C.Code § 301(d) (1973). As part of the Court Reform Act, Congress also amended section 301(d) to change the *Bolton* rule by placing the burden on a defendant acquitted by reason of insanity to prove by a preponderance of the evidence that he is no longer mentally ill or dangerous before he can be released.

75. There is currently a bill, H.R. 12081, pending before the House Committee on the Judiciary, which would provide postacquittal commitment for those found not guilty by reason of insanity of any federal offense. The bill

requires a hearing antecedent to such commitment, at which time the court must find that the person "by reason of mental disease or defect, is dangerous to himself or to the person or property of others," § 4238(f). Commitment to a federal hospital would continue until the person may be "civilly committed pursuant to State law to a State facility." § 4238(h). *See* note 77 *infra*. Thus, if a post-acquittal statute generally applicable to federal offenses is enacted, it appears likely that it will require a commitment hearing similar to the one required by *Bolton*.

Past efforts to enact similar legislation have been unsuccessful. *See* S. 3689 *in* 112 Cong. Rec. 18326 (Aug. 4, 1966) (for commitment after acquittal by reason of insanity of federal offense, government must prove "by a preponderance of the evidence, that the person is mentally ill, and that . . . his release would constitute a danger to himself or to others.").

76. Civil commitment procedures and standards vary greatly among the states. *See* S. Brakel & R. Rock, The Mentally Disabled and the Law 34–98 (1971).

77. In most states, civil commitment is considered a "civil" proceeding, and therefore, the government is required to prove mental illness by a preponderance of the evidence. *See* Dershowitz, Preventive Confinement: A Suggested Framework for Constitutional Analysis, 51 Tex.L.Rev. 1277, 1295–1301 (1973).

This court, however, has recently held that due process requires the government to prove mental illness and dangerousness beyond a reasonable doubt before a person can be civilly committed. In Re Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648 (1973). *See also* In Re Pickles, 170 So.2d 603 (Ct.App.Fla.1965); Ex Parte Perry, 137 N.J.Eq. 161, 43 A.2d 885 (1945).

on the defendant to establish his insanity defense by a preponderance of the evidence. It holds that the burden of proof statute is neither a denial of equal protection nor due process.

## A. EQUAL PROTECTION

The court summarily concludes that the application of a burden of proof standard for D.C.Code offenses different from that for federal offenses is not a denial of equal protection because "[i]n enacting local criminal statutes [for the District of Columbia], Congress need not hew to the same path it elects in defining criminal offenses of nationwide applicability." (Court's opinion at 1153.) Rather than resting upon this sort of *ipse dixit,* it seems to me that equal protection requires some consideration of the reasons that would permit the same legislature to impose a burden of proof for the trial of D.C. crimes that is different from the one applied in the trial of federal crimes.[78]

While I am troubled that the court fails to conclude that Congress is barred from enacting a different burden of proof statute for D.C.Code offenses, I am even more concerned that the court thinks the question unworthy of serious consideration. The District of Columbia, which is over seventy percent black,[79] is wholly disfranchised. Traditionally, this would call forth a higher standard of equal protection scrutiny.[80] In this jurisdiction, however, it appears that it does not.

## B. DUE PROCESS

The court also rejects appellant's argument that any statute, irrespective of

application, requiring a defendant to prove his insanity is a denial of due process. Appellant relies on In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L. Ed.2d 368 (1970), which held that the government must "pro[ve] beyond a reasonable doubt . . . every fact necessary to constitute the crime," and claims that sanity is such a fact. In rejecting this contention, the court advances several arguments, reasons, and cases, which I shall examine in some detail. First, however, it is helpful to place the question in its proper historical context.

In 1895, Justice Harlan writing for a unanimous Supreme Court reversed a murder conviction because the trial court had instructed the jury that "the burden of proof of the insanity rests with the defendant." Davis v. United States, 160 U.S. 469, 477, 16 S.Ct. 353, 354, 40 L.Ed. 499. The Court found that sanity was an "essential fact" of the crime of murder, and that the burden was on the prosecution "to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." *Id.* at 493, 16 S.Ct. at 360.

In 1952, the Court upheld the constitutionality of an Oregon statute requiring the defendant to prove his insanity beyond a reasonable doubt, Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L. Ed. 1302, and indicated that *Davis* was not a constitutional holding, "but only the rule to be followed in federal courts." *Id.* at 797, 72 S.Ct. at 1007. Justices Frankfurter and Black dissented, arguing that, by definition, a homicide without sanity is not a murder. They noted

---

**78.** *See* United States v. McDonald, 156 U.S. App.D.C. 338, 481 F.2d 513 518 (1973) (Bazelon, C. J., dissenting). *But see* Coleman v. United States, 118 U.S.App.D.C. 168, 334 F. 2d 558, 565–566 (1964) (Congress may allow juries to prohibit capital punishment in murder cases in "the special maritime and territorial jurisdiction," while not permitting them to do so in D.C.).

**79.** *See* United States Dep't of Commerce, General Population Characteristics: United States Summary, Pub. No. PC (1)–B1 (Jan. 1972) at 323, 333. Moreover, approximate-

ly 95% of those arrested for serious offenses in the District are black. *See* Metropolitan Police Department of Washington, D.C., Annual Report, Pt. II at 34–57 (1972).

**80.** *See, e. g.,* United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Harper v. Virginia Bd. of Elec., 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

that "[t]his duty of the State of establishing every fact of the equation which adds up to a crime, and of establishing it to the satisfaction of a jury beyond a reasonable doubt is the decisive difference between criminal culpability and civil liability." Id. at 805, 72 S.Ct. at 1011. After *Leland*, we continued to apply the "beyond a reasonable doubt" standard in this jurisdiction.[81]

Finally, in 1970, in *Winship*, which involved an adjudication of juvenile delinquency,[82] the Court went beyond the factual context of the case before it to hold:

> Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon *proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.* 397 U.S. at 364, 90 S.Ct. at 1073 (emphasis supplied).

Due to the intentionally broad holding of *Winship*, the question for this court in deciding whether the D.C. burden of proof statute violates due process is whether *Winship* overrules. *Leland sub silentio* [83]—that is, whether "sanity" is a "fact necessary to constitute the crime." *Davis* held that sanity was such a fact. Indeed, it is at least instructive that in setting out its holding the *Winship* Court returned to the *Davis* formulation of "every fact necessary to constitute the crime." This court fails to mention *Winship*'s plain adoption of the *Davis* formulation.

The court offers nine justifications for its conclusion.

*First:*

"Winship involved proof of facts—'the occurrence of an event'—while insanity deals with proof of 'mental condition and propensity.' United States v. Brown, [155 U.S.App.D.C. 402, 478 F.2d 606, 609 (1973)]." (Court's opinion at 1155.)

On the contrary, sanity, as *Davis* clearly indicates, has always been a factual question, and nothing else. The panel cites no cases, and I believe there are no cases, suggesting that sanity, unlike the act in question, is not a factual issue.

The court's reliance on United States v. Brown is misplaced. When *Brown* refers to "mental condition and propensity," it is explicitly describing "dangerousness," which is, presumably, a present status indicative of future behavior.[84] Insanity, on the other hand, involves the same sort of factual inquiry needed to determine premeditation, deliberation, and intent, all of which are clearly covered by *Winship*.[85]

*Second:*

"The Supreme Court's opinion in *Winship* cited with approval a group of prior decisions, including Leland v. Oregon." (Court's opinion at 1155.)

The Court did cite *Leland* once, (as part of a string citation that included *Davis*), but only to support a proposition that can hardly comfort my brethren:

> Expressions in many opinions of this Court indicate that it has long been assumed that proof of a criminal

---

81. *See, e. g.*, McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 849 (1962) ; Adams v. United States, 134 U.S.App.D.C. 137, 413 F.2d 411, 415 (1969) ; United States v. Carter, 141 U.S.App.D.C. 46, 436 F.2d 200 (1970).

82. The Supreme Court has been less vigilant in protecting the procedural rights of juveniles than adults. *Compare* McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed. 2d 647 (1971) (jury trial not required in state juvenile delinquency adjudication), *with* Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct.

1444, 20 L.Ed.2d 491 (1968) (jury trial required in state criminal proceeding).

83. Even before *Winship*, some commentators had cast doubt upon the continuing vitality of *Leland*. *See* Report of the President's D.C. Crime Commission 553 (1966).

84. Obviously, a finding of insanity at the time the crime was committed says nothing about the perpetrator's "propensity."

85. The court in this case acknowledges that "intent" comes within the *Winship* holding. Court's op. at 1155.

charge beyond a reasonable doubt is constitutionally required. 397 U.S. at 362, 90 S.Ct. at 1071.

Immediately thereafter, the Court quotes approvingly from the *Leland dissent:*

[i]t is the duty of the Government to establish . . . guilt beyond a reasonable doubt. This notion—basic in our law and rightly one of the boasts of a free society—is a requirement and a safeguard of due process of law in the historic, procedural content of "due process." 397 U.S. at 362, 90 S.Ct. at 1071, *quoting* 343 U.S. at 802–803, 72 S.Ct. 1002 (elipses in original).

Then, further down the page, the *Winship* Court had this to say about *Davis:*

In *Davis* a murder conviction was reversed because the trial judge instructed the jury that it was their duty to convict when the evidence was equally balanced regarding the sanity of the accused. This Court said: "On the contrary, he is entitled to an acquittal of the specific crime charged if upon all the evidence there is reasonable doubt whether he was capable in law of committing crime. . . . No man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them . . . is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." 397 U.S. at 362–363, 90 S.Ct. at 1072, *quoting in part* 160 U.S. at 484, 493, 16 S. Ct. 353 (elipses in original).

These quotations are the heart of the Court's ruling on the burden of proof standard. They leave precious little doubt that *Winship* intended to include sanity within its constitutional holding.[86]

*Third:*

"The essential elements of the charge of felony murder do not include proof of sanity." (Court's opinion at 1155.)

The D.C. burden of proof statute applies to all crimes, not just felony murder. Thus, the question before the court was whether sanity is generally an element of criminal behavior. Indeed, the court's summary affirmance of the application of the new burden of proof statute to appellant's robbery convictions indicates that it was not concerned with the elements of a particular offense in deciding the statute's constitutionality.

Even if it was appropriate to decide the constitutionality of the statute by considering a particular offense, felony murder was an especially poor selection. Its statutory definition, unlike that of most crimes, requires the perpetrator to be "of sound memory and discretion." 22 D.C.Code § 2401. The court fails to consider this statutory definition when it discusses the constitutionality of the burden of proof statute as it applies to felony murder.

Earlier in its opinion, however, the court rejected appellant's argument that the trial court's failure to instruct the jury that "the government must prove [sound memory and discretion]" was error. The court suggested that this issue is "well-settled" against appellant be-

---

86. The Court's reasons for constitutionalizing the "beyond a reasonable doubt" standard also demonstrate its intention to include sanity within the holding:

The accused during a criminal prosecution has at stake interests of immense importance, *both* because of the possibility that he may lose his liberty upon conviction and because of *the certainty that he would be stigmatized by the conviction.* Accordingly, a society that values the good name and freedom of every individual should not *condemn* a man for commission of a

crime when there is reasonable doubt about his guilt. 397 U.S. at 363–364, 90 S.Ct. at 1072. (emphasis supplied).

The rationale upon which the insanity defense rests is that a person who is unable to control himself at the time he commits an antisocial act should not be "condemned" or "stigmatized." *See* Holloway v. United States, 80 U.S.App.D.C. 3, 148 F.2d 665 (1945); Durham v. United States, 94 U.S. App.D.C. 228, 214 F.2d 862 (1954); United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972).

cause several cases [87] have held that sound memory and discretion need not be alleged in the indictment. The cases cited by the court, however, all rely upon Hill v. United States, 22 App.D.C. 395 (D.C.Cir.1903), which, while holding that "sound memory and discretion" need not be alleged in the *indictment*, also noted with approval that the trial judge had instructed the jury that they must find "beyond all reasonable doubt that the defendant . . . was a person of sound memory and discretion," and that the government "establish[ed] the fact of sanity beyond a reasonable doubt." 22 App.D.C. at 408. Thus, whether the government need prove "sound memory and discretion" in a felony murder case is hardly "well-settled." [88]

Thus, even if we were to read *Winship* not to include sanity within its holding, it might still be argued that once Congress chooses to make sanity a part of the statutory definition—as it has with felony murder—the government must prove the existence of this element beyond a reasonable doubt.

*Fourth:*

"Here [unlike *Davis*], the charge is felony murder, not common law murder, and accordingly, no proof of premeditation, deliberation, and malice is required." (Court's opinion at 1156.)

While this distinction between *Davis* and the present case is true, it is also irrelevant. *Davis*, of course, has never been limited to premeditated murder cases.[89]

Moreover, the court's distinction between premeditated murder and felony

murder cuts in the wrong direction, as the Supreme Court in *Leland,* and this court in United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969 (1972) (en banc), seem to suggest. When the prosecution must prove "premeditation and deliberation" beyond a reasonable doubt, and the jury is allowed to consider the evidence of the defendant's mental illness in deciding whether the government has satisfied its burden on these cognitive factors, the government is required to make a significant showing on mental state and intent. Thus, in setting out the facts in *Leland,* the Court was careful to note that the trial judge had instructed the jury that the state had the burden of proving beyond a reasonable doubt:

> premeditation, deliberation, malice and intent, . . . [and] that the evidence adduced during this trial to prove defendant's insanity shall be considered . . . in regard to the ability of the defendant to premeditate, form a purpose, to deliberate, act willfully, and act maliciously. 343 U. S. at 794–795, 72 S.Ct. at 1005.

And in *Brawner,* in explaining why the jury should be allowed to consider the evidence of mental illness on the question of intent, we made specific reference to the effect of the recently enacted D.C. statute governing the burden of proof on insanity pleas:

> [T]o the extent that the [D.C. burden of proof statute] leads to a conviction of first degree murder when the evidence is in equipoise on the issue of insanity, there would be an additional miscarriage of justice if the evidence were not available for consideration as

---

87. *See* cases cited in court's op. at 1151–1152.

88. The court also claims that "[i]n United States v. Green, 150 U.S.App.D.C. 222, 463 F.2d 1313 (1972), in footnote 5, we affirmed what we held in *Hill* and *Coleman, supra.*" (Court's op. at 1152.) *Green* did nothing of the sort. In footnote 5, the *Green* court said, "[i]t is by no means clear that 'sound memory and discretion' is an element of first degree murder requiring affirmative proof." The court continued,

however, "[w]e mention this in passing, as we are not called upon in this case to decide whether the matter does require affirmative proof in all cases, since the proof *was* made here." (Emphasis in original.)

89. *See, e. g.,* United States v. Carter, 141 U.S.App.D.C. 46, 436 F.2d 200 (1970) (robbery and assault with a deadly weapon); Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954) (housebreaking).

raising a reasonable doubt on the issue of premeditation and deliberation. 471 F.2d at 1002.

Appellant in this case was made to suffer precisely this "additional miscarriage of justice," although the court here makes no mention of it. His trial was conducted under the now defunct *Fisher* [90] doctrine, which prohibited the jury from considering the evidence of a defendant's mental illness in deciding whether the requisite mental state for murder existed. Indeed, the miscarriage of justice was even greater here since the trial court bifurcated appellant's trial over his objection; thus, the jury was wholly cut off from the evidence on appellant's mental state, and was unable to consider it even in the informal sense of jury notification tolerated in this jurisdiction.[91] It is notorious that juries consider evidence of mental disorder to return verdicts for lesser degrees of homicide [92] as a compromise between a conviction of first degree murder and an acquittal by reason of insanity.[93]

Appellant challenged the trial court's action bifurcating the trial over his objection. This court simply holds that bifurcation is largely within the "discretion" of the trial court; it cites no case permitting bifurcation over the objection of the defense.[94] More importantly, it does not consider how this problem is affected by the jury's widely known reluctance to accept an insanity plea, which is further aggravated by the fact that the *defendant* had to prove his insanity.

Once again, then, even if we were to hold that due process does not generally require the prosecution to prove sanity beyond a reasonable doubt, it might well be argued that appellant was denied due process in this case because the jury was totally barred from weighing the evidence of his mental condition as bearing on the degree of culpability.

*Fifth:*

"If [sanity were an essential element of felony murder], the Government would be required to produce evidence establishing sanity beyond a reasonable doubt as part of its direct case, before the defendant introduced an iota of testimony, and that is not and never has been the law. . . . *Davis* in effect confirms [this] observation . . . for otherwise *Davis* would have required the prosecution to have proved sanity beyond a reasonable doubt as part of its direct case." (Court's opinion at 1155, 1156.)

*Davis* explicitly holds that sanity is a "fact essential to constitute the crime," and that "[t]his view is not at all inconsistent with the" requirement that the government need not satisfy its burden until the accused produces "some evidence" of insanity.[95] 160 U.S. at 485–

---

90. Fisher v. United States, 80 U.S.App.D.C. 96, 149 F.2d 28 aff'd 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946).

91. *See* United States v. Dougherty, 154 U.S. App.D.C. 76, 473 F.2d 1113, 1130–1137 (1972) (refusal to give jury nullification instruction not error although jury has prerogative to disregard legal requirements in reaching verdict). *But see id.* at 1138 (Bazelon, C. J., dissenting in part) (jury should be instructed on nullification).

92. Second degree murder and manslaughter are lesser included offenses of both felony murder and premeditated murder. *See* Fuller v. United States, 132 U.S.App.D.C. 264, 407 F.2d 1199 (1968).

93. What Justices Taft and Frankfurter have said in other contexts is appropriate here: "We would have to be [a] 'blind' Court . . . not [to] see what '[a]ll others can see and understand.'" United States v. Rumely, 345 U.S. 41, 44, 73 S.Ct. 543, 545, 97 L.Ed. 770 (1953), *quoting* Child Labor Tax Case, 259 U.S. 20, 37, 42 S.Ct. 449, 66 L.Ed. 817 (1922).

94. *See* cases cited at court's op. 1157. Most of these cases hold that it is not error for the trial judge to refuse a defense request for bifurcation.

95. The *Davis* Court explained that the defendant was required to introduce some evidence of insanity because of the "presumption which the law, justified by the general experience of mankind as well as by considerations of public safety, indulges in favor of sanity." 160 U.S. at 486, 16 S.Ct.

486, 16 S.Ct. at 357. Thus, the court in the present case completely misstates *Davis.*

*Sixth:*

"In determining whether Leland v. Oregon is modified or overruled by In Re Winship, consideration should be given to the more recent case of Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), in which the Court held that it was consistent with due process to determine the voluntariness of a confession by a preponderance of the evidence rather than by proof beyond a reasonble doubt." (Court's opinion at 1155.)

*Winship,* in plain terms, does not apply to the burden of proof required in testing the voluntariness of a confession. Thus, the question in *Lego* was whether to *extend Winship,* not whether to apply it. The Court decided not to extend it because "a voluntariness hearing . . . has nothing whatever to do with improving the reliability of jury verdicts." 404 U.S. at 486, 92 S.Ct. at 625. The insanity defense, on the other hand, has a great deal to do with "the reliability of jury verdicts."

*Seventh:*

"[In United States v. Braver, 450 F. 2d 799 (1971), the Second Circuit] held that placing the burden of proving inducement [as part of an entrapment defense] on the defendant does not constitute a denial of due process." (Court's opinion at 1155.)

In the Second Circuit the defense of entrapment is split into two elements:

governmental inducement and the criminal propensity of the defendant. The *Braver* court indicated, and the Supreme Court has subsequently reaffirmed,[96] that if the prosecution proves propensity, the entrapment defense fails, irrespective of a showing of governmental inducement. Thus, inducement obviously negates no element of the crime since the crime can be proved notwithstanding such a showing. Propensity, on the other hand, bears directly on criminal intent; if propensity is not proved, proof of the crime fails. On propensity, as *Braver* noted, and as this court fails to mention, the government has the burden of proof beyond a reasonable doubt.[97]

*Eighth:*

"In Phillips v. State, [86 Nev. 720, 475 P.2d 671,] the Supreme Court of Nevada rejected the argument that In Re Winship changes the concept [of *Leland*] that one asserting the affirmative defense of insanity must prove insanity by a preponderance of the evidence." (Court's opinion at 1156.)

This naked holding of a state supreme court, unsupported by any analysis or reasoning, does not lend much weight to the court's conclusion. For what it is worth, however, the Nevada opinion explicitly rests on the "well-settled" rule that "insanity is an affirmative proposition."[98] In this jurisdiction, we have repeatedly held that the insanity plea is more than an affirmative defense, and that at times the interest of justice requires the court or prosecution to raise the issue even over the objection of the defendant.[99] In fact, the burden

at 357. Nonetheless, it concluded, "a verdict of guilty [cannot] be properly returned, if the jury entertain a reasonable doubt as to the existence of a fact which is essential to guilt, namely, the capacity in law of the accused to commit th[e] crime." *Id.* at 488, 16 S.Ct. at 358.

96. United States v. Russell, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973) ("jury finding as to predisposition . . . fatal to claim of entrapment").

97. *See* United States v. Sherman, 200 F.2d 880 (2nd Cir. 1952) (L. Hand, J.).

98. *See* Gallegos v. Nevada, 84 Nev. 608, 446 P.2d 656 (1968).

99. *See* Overholser v. Lynch, 109 U.S.App. D.C. 404, 288 F.2d 388, 392 (1961) (en banc) ("insanity is not strictly an affirmative defense and can be raised by either the court or the prosecution"); Whalem v. United States, 120 U.S.App.D.C. 331, 346 F.2d 812 (1965) (en banc).

of proof statute in question provides that the defendant must prove his insanity "regardless of who raises the issue."

The court also notes that the Supreme Court denied *certiorari* in the Nevada case, with only two Justices dissenting.[100] The Supreme Court itself, however, has repeated countless times that a denial of *certiorari* "carries with it no support of the decision in that case, nor of any of the views in the opinion supporting it." Agoston v. Pennsylvania, 340 U.S. 844–845, 71 S.Ct. 9, 95 L.Ed. 619 (1950) (opinion of Frankfurter, J.).

*Ninth:*

"[S]anity is not one of the elements of felony murder but lack of sanity may be interposed as a defense." (Court's opinion at 1155.)

Throughout its opinion the court seems to suggest that because we discuss the question of criminal responsibility under the rubric of the "insanity *defense*," sanity is not an element of the crime. It would be hollow, to say the least, for us to look at the label attached to the question at issue in deciding if *Winship* was meant to apply. Such an approach would allow the state to require a defendant to prove his "alibi *defense*" by a preponderance of the evidence. *Compare* Stump v. Bennett, 398 F.2d 111 (8th Cir. 1968) (en banc) (violation of due process to require defendant to prove alibi defense).

Thus, the cases, propositions, and arguments marshalled by the court fail to support its conclusion that *Winship* does not require the government to prove sanity beyond a reasonable doubt. On the contrary, almost without exception, they support precisely the opposite conclusion.

## V

The issues in this case are critical to the fair administration of justice—for the prosecution[101] as well as the defense. Moreover, they are central to the proper functioning of the new relationship between the federal criminal system and the recently created D.C. system. Because of the importance of these matters, it was necessary in setting forth my views to show that the opinion of the court ignored controlling precedent,[102] misstated,[103] misrepresented[104] and misapplied[105] several authorities, and manifested a failure to understand basic principles of equal protection analysis[106] and the felony murder doctrine.[107] It was my hope and expectation that the court would offer a reasoned response fully ventilating all of these issues. Regrettably, the only response was an admission from Judge Leventhal that the issues are "arguable" but too "narrow" to merit *en banc* consideration.

---

100. 403 U.S. 940, 91 S.Ct. 2260, 29 L.Ed.2d 719 (1971). Justices Black and Douglas voted to grant *certiorari*.

101. *See* pp. 1167–1169 *supra*, and court's op. at 1158.

102. *See* United States v. Canty, discussed at pp. 1165–1166 *supra;* United States v. Thompson, discussed at p. 1164 *supra.*

103. *See* United States v. Green, discussed in note 88, and court's op. at 1152; Davis v. United States, discussed at 1178–1179 *supra*, and court's op. at 1156.

104. *See* Johnson v. United States, discussed at p. 1162–1163 *supra*, and court's op. at 1149; United States v. Brown, discussed at p. 1175–1176 *supra*, and court's op. at 1154–1155.

105. *See* United States v. Hooper, discussed at p. 1166–1167 *supra*, and court's op. at 1158; United States v. Benn, discussed in note 46 *supra*, and court's op. at 489.

106. *See* 1170–1174 & n. 25 *supra*, and court's op. at 1151, 1153.

107. *See* pp. 1167–1169 *supra*, and court's op. at 1158.